Jesse I. Moritz, Appellant, v. The Kansas City Star Company, a Corporation, Respondent, No. 42808—258 S. W. (2d) 583.

Court en Banc, June 8, 1953.

*Paul C. Sprinkle, William F. Knowles, Roy C. Carter* and *Sprinkle, Knowles & Carter* for appellant.

*Carl E. Enggas, James C. Wilson* and *Lewis E. Pierce* for respondent; *Watson, Ess, Whittaker, Marshall & Enggas* of counsel.

BARRETT, C.—Mr. Jesse I. Moritz, a lawyer, instituted this action for libel against the Kansas City Star Company, the publisher of the *Kansas* ▮ *City Star* and the *Kansas City Times*. The action was in four counts, based upon a series of four articles published in the *Star* and the *Times* on October 20th, 21st, 27th and November 3rd, 1945. There was a jury verdict for the defendant on the third and fourth counts, and a verdict for the plaintiff on the first count for $3500 actual and $3500 punitive damages, and on the second count for $3250 actual and $3250 punitive damages. The trial court sustained the defendant's motion for a new trial upon the specified ground that the court had erred in giving instruction number one at the request of the plaintiff. The plaintiff, Mr. Moritz, has appealed from that order and contends here that the instruction was not so prejudicially erroneous as to require the granting of a new trial. The Kansas City Star Company contends that the instruction was prejudicially erroneous and, in addition, contends that the publications complained of in counts one and two were not libelous of the plaintiff, were qualifiedly privileged and, since there was no proof of express malice, that the court erred in not directing a verdict in its favor on those counts.

The first article was written in these circumstances: The publisher's capable police reporter, with forty years experience, has an office across the street from the Municipal Court Building. There is a loudspeaker in his office connected with the police radio system and all police radio broadcasts and reports are heard in his office. About 11:15 on Saturday morning, October 20th, 1945, a report came over the loudspeaker that a streetcar had crashed into the rear of another streetcar and the reporter immediately telephoned the city editor and was informed, since other reporters were not available, that he should "get the story." The reporter said that he waited a half hour until the officers returned to the 63rd Street Police Station when he got in touch with them and "took my notes and got the names and as much of the information as I could about the car crash." He said that he learned from them that in connection with the accident they had "arrested a man who interfered with the men taking names of the victims and getting their police report, and said this man interfered with them there, bothered them." After obtaining this information

he called the publisher's office and gave the story to a "rewrite reporter" who prepared the article, except the headlines, for publication. The two articles, italicizing the language particularly complained of, are as follows:

### "WOE TO POLICE HELPER
### JESSE I. MORITZ IS ARRESTED
### IN TRAM COLLISION
Officers Say Man Who Called
Himself a Lawyer Was Interfering
With Their Rescue Work.

"The man making the most noise this afternoon just after one streetcar rammed the rear of another at Swope Parkway and Park Avenue was not one of the five passengers injured, police said.

"While four passengers lay on the parkway awaiting ambulances from the General Hospital and police were attempting to stop blood flowing from the left thumb of the operator of one streetcar, the man was shouting police said.

### "POLICE SAY HE SHOUTED

" 'I'm a lawyer, I'm a lawyer!' They said a man who hurried to the scene called to the accident victims and to other passengers on the cars at the time of the crash.

"On the ground lay Edith Griffith, 59 years old, 3244 Michigan Avenue, and C. E. McCorkle, 27, of 4726 Park Avenue, who were taken to the General Hospital. Also there, awaiting an ambulance were two Negro women, Lucile Stevenson, 36, of 2440 Euclid Avenue and Hannah Shelby, 55, of 5321 South Benton. Both were taken to General Hospital No. 2.

*"Police said the man bent over victims attempting to take their names and addresses,* interfering with police attempts to obtain necessary information.

### "TAKEN TO POLICE STATION

"Unable to proceed with their investigation, police said they arrested the man and he was taken to the Sixty-third street station.

"There the man identified himself as Jesse I. Moritz, 46 years old, 2317 Swope Parkway. He said he was a lawyer, with an office in room No. 1633 at the Dierks Building.

"He was booked for interfering with an officer. Bond was set at $50 which Moritz posted about two hours later.

*"Moritz denied he was soliciting business at the scene of the accident.* He said he was there to help and was taking names and addresses in order to assist police.

" 'I was just trying to help out,' he insisted. 'I had no other reason for being there.'

### "BOTH CARS GOING EAST

"The two streetcars were traveling east on Swope Parkway when the first, operated by F. A. Fleming, 70 years old, 4235 Woodland Avenue, thirty-three years an employee of the Kansas City Public Service Company, stopped the car to discharge passengers at Park Avenue.

"G. A. Foutch, 43 years old, 644 Southwest Boulevard, operator of the rear car, said he was moving at fifteen to twenty miles an hour and believed he had plenty of time to stop. He didn't.

"Foutch's car rammed the rear of the other car, penetrating about five feet and shattering virtually all the glass in both cars. His left thumb was lacerated severely and he was treated at the scene. He said he had been with the company thirty days.

"At the hospital it was reported that none of the victims suffered dangerous injuries.

### "POLICE HELPER TRIAL SET

### JESSE I. MORITZ FACES CHARGE OF INTERFERING WITH OFFICER

"The trial of Jesse I. Moritz, 46 years old, 2317 Swope Parkway, charged with interfering with an officer while police were caring for injured passengers and making reports after two streetcars had collided yesterday at Swope Parkway and Park Avenue, will be held in the municipal court Thursday morning.

"*The police accuse Moritz of shouting, 'I'm a lawyer, I'm a lawyer,' and bending over injured victims in an effort to obtain their names.* Moritz said he was trying only to assist the police. He was released on $50 bond.''

As the publisher urges, in so far as the articles report the actions and activities of police officers, including the details and reasons for Mr. Moritz's arrest, his trial and acquittal upon the charge of "interfering with officers at the scene of accident," they are qualifiedly privileged. People's United States Bank v. Goodwin, 148 Mo. App. 364, 128 S. W. 220; Burrows v. Pulitzer Pub. Co., (Mo. App.) 255 S. W. 925; Tilles v. Pulitzer Pub. Co., 241 Mo. 609, 145 S. W. 1143. Since the occasion of the publications is qualifiedly privileged, however, the reports must be fair and accurate and if the publisher summarizes or abridges, or undertakes to state additional facts based upon its own investigation the publication of such additional facts is not privileged if they are false and "to stay within the field of this privilege, he must not state his conclusions as facts, unless they are true." Further excerpting from Warren v. Pulitzer Publishing Co., 336 Mo. 184, 78 S. W. (2) 404, the limitations of the rule and the qualifications upon the privilege are these: "Since the truth is always a defense to libel, where only true facts are stated, no defense of privilege is necessary. Likewise, since there is no right to

knowingly spread false facts about anyone, there can be no question of privilege to do that. A question of privilege properly arises, when the publication of a statement of true facts also contains a report of charges or statements made by others which may not be true. A somewhat similar question is presented when an article contains also inferences by way of comment, which may not be true, although drawn from true facts. (36 C. J. 1279-80, sec. 280; Newell, Libel & Slander, 519, sec. 480.) Ordinarily, no one has the right to broadcast incorrect inferences and conclusions about another's motives, intentions, and conduct (36 Cyc. 1281, sec. 283) ; and nothing is better settled than the proposition that no one is justified in stating false facts about another merely because some one else has done so.'' In speaking of the qualified privilege of publishing accounts of official proceedings, there of a church disciplinary proceeding, the court said, ''Not only must the subject be one which the publisher is privileged to report, but his motive in doing so must be proper (free from malice) and his report must be fair and accurate. To keep within his privilege, the publisher need not publish the entire proceedings, but whatever summary or abridgement he chooses to make, must be a fair statement, and when he undertakes to state additional facts, not brought out in the hearing but gleaned from his own investigation, he does so at his peril, if they are false, exactly the same as he would in connection with an unprivileged matter.''

 The streetcars collided on Swope Parkway at Wabash, one block west of Prospect. The first streetcar stopped at Wabash to permit a passenger, Mr. Clarence E. McCorkle, to alight. Mr. Mc-Corkle lived at 4716 Park, in the vicinity of Prospect and Swope Parkway. He had been shopping and was carrying his small son and some groceries and as the streetcar stopped was standing in the vestibule. When the streetcars collided Mr. McCorkle was thrown from the front streetcar, landing on his back in the parkway. Mr. Moritz lived at 2317 Swope Parkway and, at the moment of the collision, was raking his yard. He was wearing a blue work shirt and an old pair of paint spotted green trousers and a gray striped cap. He heard the collision of the streetcars, looked up, and saw his neighbor, McCorkle, lying on the ground, holding the baby. He recognized Mr. McCorkle as a casual acquaintance who lived in the neighborhood, and his wife and sister-in-law were patrons of Mrs. McCorkle's beauty shop. After assisting in calling the police and an ambulance he ran across the street, and, according to him, was the first person to arrive on the scene.

Bearing in mind the two articles and their recitation of specific details, Mr. Moritz's version of subsequent events is this: Mr. Mc-Corkle appeared to be stunned and the baby was crying, and he leaned over McCorkle and told him that the police and an ambulance had been called and ''to take it easy.'' As he talked to McCorkle a

streetcar motorman came up and asked whether he had seen the accident. Mr. Moritz says that he told the motorman he had heard the crash but had not seen the streetcars collide. The motorman asked his name and he gave it and said that he lived ''in that house right over there.'' One of the motormen handed him a ''streetcar company card'' and said, ''Sign that.'' Mr. Moritz told him that he didn't want to sign the card and the motorman said, ''You have to sign it.'' ''When he said I had to sign it, I said, 'Just a minute. I am a lawyer.' Just as soon as I said that, this other police officer had straightened up from Mr. McCorkle, and Mr. Fleming (the streetcar motorman) turned to him and said, ''Get this lawyer away from here and keep him away. He will get all these cases.' '' Officer Allin immediately took hold of his arm and his trousers and forcibly placed him in a police car, and, afterwards, took him to the 63rd Street Police Station where he was charged with interfering with an officer.

Mr. Moritz denied that he had a pencil and notebook, and denied that he gave anyone his name or that he asked or took the name of any person at the scene of the accident. During the time he was there he was not aware that anyone other than McCorkle was injured and did not learn that three or four other people had been injured and taken to the hospital until he read the paper. He did not see any other injured person and did not talk to any passenger on the streetcar other than McCorkle. It was his view that the policemen were doing but little by way of assisting or caring for McCorkle or anyone else. He denied that he interfered with the police and their work in any manner. He saw but one person in the parkway and that was McCorkle and he did not bend over injured persons in an attempt to obtain their names and addresses. He did tell the motorman that he was a lawyer, but he denied that he ''shouted 'I'm a lawyer, I'm a lawyer.' '' He claims that he did not argue with the police and he said that no one accused him of soliciting business at the scene of the accident. He claimed that the only reason he was there was because he recognized Mr. McCorkle and wanted to help him if he could. He denied that he solicited McCorkle's case or anyone else's case and he did not represent McCorkle or any other person involved in the accident, and when he was tried in police court no one testified, at least not five persons, that he was attempting to get their names and addresses.

The publisher contends, nevertheless, that it did not purport to report what Mr. Moritz said or did, but merely reported what the police stated and that there was a police report and that there were no facts in the articles derogatory of him that did not also appear in the police report. The fact of the matter is that the police made two reports, one concerning the collision and the second concerned the arrest of Mr. Moritz for ''interfering with officers at the scene of

accident." The latter report, under the heading of "Details (report all facts in logical sequence) :" said,

"The above defendant (Jesse I. Moritz) was arrested at the scene of an accident, at Swope Parkway and Park, this date at 11:15 A.M. The accident involved two streetcars, four persons were injured and taken by city ambulance to the General Hospital.

"While treating Mr. McCorkle for shock, the defendant came upon the scene dressed in old dirty work clothes and an old cap carrying a notebook and pencil, shouting 'I'm an attorney.' He was informed in a nice way that if he saw the accident, in which case he stated he had, it would be appreciated if he would give his name and address to the Officer making the report. He refused stating that he was representing the man that was being treated for shock. He was instructed to leave the injured man alone. At this time he raised up from the injured man and shouted, 'Who are you to interfere with my business.'

"The defendant's actions at the scene of this accident were very irregular. He was booked at #4 station for interfering with Police Officers at the scene of an accident."

The first article, however, was not written or based upon the written police report. The collision occurred at 11:15 and the article appeared in the publisher's 2 o'clock edition of the paper. The first article was based upon what the officers told the police reporter. It is not made to appear in the record as plainly as it should, but, as we understand, the reporter did not obtain his information by a personal interview with the police officers. On cross-examination he said, "I believe I talked to him (a police officer) when I called back. You know, I made two or three calls. That is when they told me what the man was charged with." But, whether he obtained the information by personal interview or by telephone, he did not see the police report until Monday, October 22nd, two days after the appearance of the first article. The arresting officer, in testifying upon this trial said that Mr. Moritz had a notebook and pencil and "was bending over this injured gentleman and asking him questions as to who he was and where he lived. * * * He was talking to Mr. McCorkle that he was an attorney, and I walked over and asked him to refrain from questioning the man at that particular time, whom I judged was suffering from shock, and he raised up real suddenly and swung his arms up and said, 'Who are you to interfere with my business?'" This officer did not remember talking to a *Star* reporter, he thought he did but if he did he could not remember the details of their conversation. It was his recollection that Mr. Moritz did deny that he was soliciting business, but he said, "I don't know anything about him soliciting business" and did not tell anyone connected with the *Star* about it. As a matter of fact the officer did not know that Mr. Moritz was a lawyer, he said "at that particular time he certainly

didn't look much like an attorney." The only person he saw Mr. Moritz talking to was McCorkle. It was his idea, when as he says Mr. Moritz threw up his arms "Rather than have contact with him at the scene I put him in the car and placed him under arrest." He made the arrest, not because Mr. Moritz was soliciting business, but because he was "bothering" and interfering with the police officers in their work. Furthermore, it will be observed, while the police report and the policeman mentioned only Mr. McCorkle, the two articles say that he was "bending over injured *victims* in an effort to obtain their names," and "the man bent over *victims* attempting to take their names and addresses." Upon the trial of this case the publisher's evidence, including several passengers on the streetcars, tended to prove the truth of both articles but that evidence is in direct conflict with the evidence offered by Mr. Moritz and, in view of the jury's finding, we must accept his version of the matter and his proof that in so far as the articles concern his conduct in soliciting law business the articles are a misstatement of fact and untrue. In this situation, in so far as the rules of libel are concerned, the case is governed by Warren v. Pulitzer Publishing Company, supra, and was for the jury.

 "Any statement published of an attorney at law with respect to his profession is actionable if it tends to injure or disgrace him as a member of his profession. Oral or written words which impute to him a want of the requisite qualifications to practice law or which charge him with dishonest or improper practices in the performance of his duties as an attorney are actionable per se. * * * To publish of an attorney that he solicits business is libelous per se, since it charges him with unprofessional conduct, exposes him to ridicule or contempt, and tends to injure him in his calling." 33 Am. Jur.,'Sec. 76, p. 88; 53 C. J. S., Sec. 38, p. 85; annotation 112 A. L. R. 177. As the Kentucky court has said, "From time immemorial it has been considered unprofessional for a lawyer to solicit business. This fact is recognized, not only by members of the bar, but by the public in general. When, therefore, a news article charges an attorney with soliciting business, we necessarily conclude that it is libelous. Its effect is to charge him with unprofessional conduct, and thus expose him to ridicule or contempt, and injure him in his calling." Register Newspaper Co. v. Worten, 33 Ky. L. Rep. 840, 111 S. W. 693, 697. It is a violation of the rules of this court and of the canons of ethics of the profession for a lawyer to solicit personal injury claims. Supreme Court Rules 4.27, 4.28. These articles refer directly to Mr. Moritz, their language is unambiguous, and if false, as the jury has found, plainly impute that he was soliciting business. More than a hundred years ago it was held libelous to ironically praise a lawyer as "an honest lawyer." Boydell v. Jones, 4 M. & W. 446, 150 Eng. R. 1504. And, if untrue, it is certainly libelous to print of a reputable

lawyer that he was shouting "I'm a lawyer, I'm a lawyer" and "Police said the man bent over victims attempting to take their names and addresses, interfering with police attempts to obtain necessary information. * * * Moritz denied he was soliciting business at the scene of the accident," or as the second article related "The police accuse Moritz of shouting 'I'm a lawyer, I'm a lawyer,' and bending over injured victims in an effort to obtain their names." Annotation 112 A. L. R. 177; Warren v. Pulitzer Pub. Co., supra; Spurlock v. Lombard Inv. Co., 59 Mo. App. 225.

Instruction one which the trial court thought prejudicially erroneous is as follows:

"The court instructs the jury that our statute defines a libel to be the malicious defamation of a person made public by any printing, writing, sign, picture, representation, or effigy, tending to provoke him to wrath, or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence and social intercourse; and if, therefore, you believe and find from the evidence that the article admitted to have been published by the defendant corporation of and concerning the plaintiff had a tendency to provoke him to wrath, or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence and social intercourse, then the article in question is libelous under the statute."

This instruction, obviously, is but the statutory and common law definition of libel (Mo. R. S., Sec. 559.410) and any language fairly falling within the definition is libelous per se. Seested v. Post Printing & Publishing Co., 326 Mo. 559, 31 S. W. (2) 1045. In its essentials the instruction is almost identical with refused instruction four in McCloskey v. Pulitzer Publishing Co., 152 Mo. 339, 53 S. W. 1087 and in that case it was determined that the instruction correctly defined libel and should have been given. The publisher insists, nevertheless, that this and every instruction defining libel must include the element of falsity or a requirement that the libelous words were untrue and failing in this respect it is insisted that the instruction was so prejudicially erroneous as to require the granting of a new trial. The instruction is also quite similar to an instruction in Dobbin v. C., R. I. & P. Ry. Co., 157 Mo. App. 689, 138 S. W. 682, which the court of appeals held erroneous, and the publisher insists that that case is controlling in this action. There the court observed that the instruction omitted from its hypothesis the finding that the accusations in a letter were false and in holding the instruction erroneous said, "In McCloskey v. Pulitzer Pub. Co., 152 Mo. l.c. 349, the Supreme Court held, 'The fact that the truth of the publication was a defense, was no part of the definition of libel and the instruction was not faulty because it failed to state that it was.' But in the recent case of Julian v. Kansas City Star, 209 Mo. l.c. 71 (107 S. W. 496) the

court says: 'What is libel? In Words and Phrases, vol. 5, 4116, it is defined thus: "In its most general and comprehensive sense any publication injurious to the reputation of another is a libel." In 2 Bouvier's L. D., p. 207, it is: "Everything, written or printed, which reflects on the character of another, and is published without lawful justification or excuse, is a libel, whatever the intention may have been." Since under our law the truth of the article published may be shown in justification, to the above definition the word "false" in reference to the article should be added.' The Supreme Court does not overrule the McCloskey case in terms, but in effect, and we must follow the rule of the latest decision of that court which, in adding the falsity of the publication as an element in the legal definition of libel, necessarily requires that definitive instructions of the plaintiff should include that element in their hypothesis."

The court of appeals does not mention any other instructions in its opinion, and the instruction was held to be prejudicially erroneous irrespective of any other instructions, and the court seems to have raised the question on its own initiative. Also, as the court pointed out, the Julian case did not specifically overrule the McCloskey case which specifically approved the giving of a similar instruction. Furthermore, we believe that the opinion in the Dobbin case misconceives and confuses two separate matters in the Julian case. The first important question in the Julian case was the proper venue of the action and particularly "where did the cause of action accrue?" In determining that question the court did define libel and then said, "Since under our law the truth of the article published may be shown in justification, to the above definition the word 'false' in reference to the article should be added." But the court was not then discussing or considering whether an instruction defining libel in the language of the statute was prejudicially erroneous. A subsidiary question in the Julian case was the propriety of instruction five which submitted whether the words on their face were "libelous as defined in other instructions." The instruction defining libel stated that the publication was admitted, it then set forth the language relied upon and concluded with this definition, "and the court instructs the jury that our statute defines a libel to be the malicious defamation of a person made public by any printing or writing tending to provoke him to wrath, or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, and if, therefore, you believe and find from the evidence that the article admitted to have been published by the defendant of and concerning the plaintiff had a tendency to provoke him to wrath, or to expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, then the article ▮▮▮ in question is libelous under the statute." In holding that the instruction complained of, number five, was not erroneous the

court said, ''if the definition of libel referred to was not correct, then the instruction would be misleading and it would be error. *But the definition was correct. Therefore, with a correct definition of libel before them* and the words complained of before them and the circumstances under which they were used being in evidence before them, why did not the jury have the authority to say whether it was a libel or no libel?'' And so the court in the Julian case did not overrule the McCloskey case and it did not add the requirement that an instruction defining libel should include the element of falsity. On the contrary, the Julian case plainly approves an instruction quite similar to the instruction involved here as well as in the McCloskey case.

This instruction is an abstract definition of libel and does not direct a verdict. In addition to this instruction there were six other instructions given at the request of the plaintiff, and four instructions given at the request of the defendant. The instructions submitting the publisher's hypothesis and the statutory provision that ''In all prosecutions for libel * * * the truth thereof may be given in evidence to the jury, and shall constitute a complete defense; and the jury, under the direction of the court, shall determine the law and the fact,'' (Mo. R. S., Sec. 559.440) fully and completely covered the subject of falsity and whether the libelous words were untrue. Instruction three on behalf of the plaintiff also contained the requirement ''that the publication complained of was libelous and false, * * *.'' In libel, as in other trials, the instructions must be construed as a whole, and if when so read they are not conflicting, or misleading and contain all the necessary elements they may not be said to be prejudicially erroneous. Hoeffner v. Western Leather Clothing Co., (Mo. App.) 161 S. W. (2) 722; Boehm v. Western Leather Clothing Co., (Mo. App.) 161 S. W. (2) 710; Patterson v. Evans, 254 Mo. 293, 162 S. W. 179; 53 C. J. S., Secs. 231-232, p. 353. As indicated, the instruction was a correct definition of libel and in the circumstances of this case could not constitute prejudicial error and the trial court erroneously sustained the motion for a new trial for that reason.

The articles were libelous per se and whether they injured the plaintiff, and their truth or justification were all for the jury to determine; instruction one was not prejudicially erroneous, and, accordingly, the judgment is reversed and the cause remanded with directions to reinstate the verdict and enter judgment for the plaintiff.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court en Banc. All concur.