[No. 7564–1–I.   Division One.   September 29, 1980.]

ALBERT M. MARK, *Appellant,* v. KING BROADCASTING COMPANY, *Respondent.*

---

*Albert Mark,* pro se.

*Riddell, Williams, Ivie, Bullitt & Walkinshaw* and *Steven E. DeForest,* for respondent.

CALLOW, C.J.—Albert M. Mark, a licensed pharmacist, brought an action for defamation and invasion of privacy against the defendant, KING Broadcasting Company, arising out of news stories broadcast on the defendant's television station on three occasions. Mark appeals from the trial court's entry of summary judgment in favor of KING Broadcasting.

On December 30, 1976, KING's regular evening news program reported that:

A pharmacist in West Seattle has been charged with cheating the State out of $200,000 in Medicaid funds. The King County Prosecutor's office says it is the largest Medicaid fraud case ever filed in this state. Albert Mark,

who owns two drug stores in West Seattle, is charged with filing a claim that used doctors' names who never ordered the drugs and patients' names who never received the drugs. Albert Mark will be arraigned next week.

On the following day, December 31, 1976, a KING news program reported that:

A West Seattle pharmacist has been charged with defrauding the State of $200,000 for false drug prescriptions. Albert Mark, who owns this pharmacy at 5435 California Avenue S.W., is charged with grand larceny, tampering with evidence and with ten counts of forgery. Gene Anderson, head of the Fraud Division of the King County Prosecutor's office, says Mark filed claims using names of doctors and patients eligible for Medicaid, but those doctors and patients never wrote or received prescriptions. Mark will be arraigned on January 5th.

Finally, on January 7, 1977, a KING news program again reported that:

A West Seattle pharmacist has pleaded not guilty to a charge he cheated the State out of $200,000 in Medicaid payments. . . .
Albert M. Mark is the owner of two drugstores in West Seattle. The County Prosecutor's office says over the past two years Mark has made out over $200,000 worth of false prescriptions for Medicaid patients. The bills for those prescriptions were submitted to the State's Medicaid office. State auditors found out doctors never ordered the prescriptions and their patients never got them. Mark appeared in court today. He pled not guilty to grand larceny, tampering with physical evidence and ten counts of forgery.

In conjunction with the January 7, 1977, report, KING aired a film clip taken by its cameraman from the exterior of Mark's pharmacy. The footage included shots of the exterior of the pharmacy and of the interior as seen through the front window. The view of the interior included a view of an individual with a wall–mounted telephone to an ear.

On the morning of December 30, 1976, an information was filed by the King County prosecutor's office in King

County Superior Court charging Mark with grand larceny, 10 counts of forgery, and tampering with physical evidence. Regarding the grand larceny charge, the information alleged that Mark defrauded the State of "checks and money of a value in excess of $75," and that Mark "submitt[ed] voluminous amounts, the exact number unknown, of forged and false prescription forms" and had "collected substantial sums of money from the Department, the total amount unknown, in the form of payment on the aforesaid false and fraudulent prescriptions."

An affidavit of probable cause, which was a matter of public record and signed by the chief deputy prosecuting attorney, provided in relevant part as follows:

> The instances collected by the Department of Social and Health Services investigators pursuant to the search warrant and through subsequent inspection of records maintained on Mark's premises coupled with follow–up interviews of doctors and recipients reflects false claims and payments substantially in excess of $75.
>
> Further, in that regard an audit was begun on or about October 12, 1976. At that time, a sampling of Medicaid prescriptions billed by Mark to the department were taken from records subpoenaed for inspection but kept at the premises. The sample period was from January 1, 1974 to August 31, 1976. The total number of prescriptions including both Medicaid and private patient for this period numbered about 135,760. Only Medicaid prescriptions were picked and the sample taken after being verified resulted in a 63% invalid figure or over $200,000 in fraud billing for the 2 2/3 years. This first audit was completed by about the end of November, 1976. A second audit to verify the first with a larger sample (300) was planned to begin December 6, 1976. The results of the first audit were communicated to Mark through his attorney and the need for verification using a larger sample was stressed.

It is undisputed that the information and affidavit of probable cause provided the factual basis for KING's news reports.

In June 1977, Mark was found guilty in King County Superior Court of grand larceny and five counts of forgery.

The State's evidence established invalid Medicaid claims totaling approximately $2,500. Mark received a 5-year deferred sentence and a 1-year county jail term with work release. Mark was also ordered to pay full restitution in an amount to be determined at a later date. Mark's conviction was affirmed in an unpublished opinion. *State v. Mark,* 23 Wn. App. 1050 (1979). Petition for review was granted on January 11, 1980. *State v. Mark,* 93 Wn.2d 1004 (1980). The exact amount of Medicaid funds involved remains unresolved as restitution proceedings are still pending.

Based on the December 30 and 31 news reports and the January 7 news report and film clip, Mark brought an action for defamation and invasion of privacy against KING in November 1978. His complaint alleged as a first cause of action that "the defendant knew, or in the exercise of reasonable care, should have known, that plaintiff was not charged with $200,000 in Medicaid fraud but only with an amount in excess of $75 and as such . . . this was not the largest Medicaid fraud case ever filed in the state." The complaint alleged that the "defendant knew, or in the exercise of reasonable care, should have known, that its statements would create a false impression in the minds of viewers that plaintiff was guilty of a $200,000 Medicaid fraud." Mark alleged as a second cause of action that the film clip aired by KING on January 7, 1977, in conjunction with the news report, was "an invasion of plaintiff's right of privacy and constituted a trespass or intrusion into plaintiff's solitude [and which] placed plaintiff in a false light in the public eye."

The trial court granted defendant KING's motion for summary judgment. The plaintiff appeals, asserting that summary judgment was inappropriate upon the evidence before the trial court.

### THE DEFAMATION ACTION

■ A qualified or conditional privilege exists permitting newspapers to publish, and television and radio to report, legal proceedings provided the publication is a fair and

accurate statement of the contents and is made without malice. *O'Brien v. Tribune Publishing Co.,* 7 Wn. App. 107, 499 P.2d 24 (1972), *cert. denied,* 411 U.S. 906, 36 L. Ed. 2d 196, 93 S. Ct. 1531 (1973); *O'Brien v. Franich,* 19 Wn. App. 189, 575 P.2d 258 (1978). The privilege attaches to pleadings which have been filed in court and is not contingent on judicial action being taken. *O'Brien v. Tribune Publishing Co., supra.*[1]

An information is a pleading, but an affidavit is not. *State v. Cronin,* 20 Wash. 512, 56 P. 26 (1899); *Brady v. Yount,* 42 Wn.2d 697, 258 P.2d 458 (1953). The distinction is not relevant to the issue here. An information is the initial pleading by the prosecutor commencing a criminal proceeding. *See* RCW 10.37; CrR 2.1. A prosecutor signing an information certifies that "he has read the pleading; [and] that to the best of his knowledge, information, and belief there is good ground to support it; . . ." CR 11, CrR 2.1. Where in a procedural area a civil rule speaks and a criminal rule is silent, the civil rule applies. *See State v. Scott,* 92 Wn.2d 209, 595 P.2d 549 (1979); *State v. Scott,* 20 Wn. App. 382, 580 P.2d 1099 (1978); and *State v. Johnson,* 21 Wn. App. 919, 587 P.2d 189 (1978). The civil rule that governs the signing of pleadings and requires the attorney of record to vouch for the veracity of the pleading, insofar as

---

[1]The privilege to publish fair reports of judicial proceedings is one of long standing. Justice Holmes quoted *The King v. Wright,* 8 Term R. 293, 298, 101 Eng. Rep. 1396 (1799), in *Cowley v. Pulsifer,* 137 Mass. 392, 394 (1884), as follows:

Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known

and he commented

The chief advantage to the country which we can discern . . . is the security which publicity gives for the proper administration of justice.

And he added that

it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

he can, pertains also to the signing of criminal informations. The same aura of responsibility covers the execution of affidavits of probable cause when signed by prosecutors.

The news media and the public have a strong interest in the reporting of information in official court documents which form part of legal proceedings and which are filed as matters of public record. In *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491–92, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975), it was stated:

> [I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice. . . .
>
> . . . The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government.

An information or an affidavit of probable cause, once filed as a matter of public record, reflects an official act performed in the course of legal proceedings so that a recounting of the contents of the record is qualifiedly privileged. *See Stone v. Hutchinson Daily News,* 125 Kan. 715, 266 P. 78, 58 A.L.R. 718 (1928); 50 Am. Jur. 2d *Libel and Slander* §§ 252, 255 (1970).

It is Mark's position that the pleadings, exhibits, and depositions before the trial judge raise questions of fact as

to the abuse of the privilege such that summary judgment should not have been granted. We find no abuse.

The three news reports broadcast by KING were a substantially verbatim recounting of the information and the filed affidavit of probable cause. They conveyed a substantially correct account of the legal documents. The broadcasts neither espoused nor embellished the allegations made in the documents, but merely reported their existence. At no time did the reports indicate a belief in the truth of the charges or express an opinion as to whether the offenses had been committed. We do not agree with the contention that because the criminal information followed the statutory definition of grand larceny, *i.e.,* property of the value of more than $75, that the use of the $200,000 figure rendered the report unfair or inaccurate. The gravamen of Mark's defamation claim is his assertion that the statements in the information and affidavits were untrue.

We find a qualified privilege,[2] holding that a plaintiff seeking to overcome the qualified privilege given the news media to publish or broadcast an allegedly false and defamatory report of the fact and substance of official criminal charges must plead and prove that the report was broadcast without reasonable grounds for belief in its truth. *Gem Trading Co. v. Cudahy Corp.,* 92 Wn.2d 956, 603 P.2d 828 (1979); *Twelker v. Shannon & Wilson, Inc.,* 88 Wn.2d 473, 564 P.2d 1131 (1977). In *Gem Trading Co. v. Cudahy Corp., supra,* we find at pages 961–62:

---

[2]Restatement (Second) of Torts § 611 (1977) grants the news media immunity from defamation actions for fairly and accurately reporting matters of public interest, *i.e.,* reporting criminal charges, stating:

§ 611. REPORT OF OFFICIAL PROCEEDING OR PUBLIC MEETING

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

*Compare Edwards v. National Audubon Soc'y, Inc.,* 556 F.2d 113 (2d Cir.), *cert. denied,* 434 U.S. 1002, 54 L. Ed. 2d 498, 98 S. Ct. 647 (1977), *with Dickey v. CBS Inc.,* 583 F.2d 1221 (3d Cir. 1978). *Cf. Moloney v. Tribune Publishing Co.,* 26 Wn. App. 357, 613 P.2d 1179 (1980).

The burden is on plaintiff to prove abuse of the privilege. Although at summary judgment all facts will be considered in a light most favorable to the opposing party, facts which will fulfill that burden if uncontroverted must be asserted by plaintiff. Proof of falsity alone, even if accepted by the jury, cannot overcome the privilege in this case so as to require that [the plaintiff's] claim for defamation be submitted to the jury. To overcome a finding by the trial court that an allegedly defamatory statement is qualifiedly privileged and to thus avoid summary judgment on that ground, it is necessary for the plaintiff to plead and prove by affidavit or otherwise that the statement was published without fair and impartial investigation or without reasonable grounds for belief in its truth.

The record here is without any evidence or inference that the three news reports were broadcast without reasonable grounds for belief in the truth of their content. The qualified privilege was not overcome. Under the circumstances, the television station was not under an obligation to independently investigate the validity of criminal charges made by the prosecutor in official court documents prior to broadcasting a fair and accurate account of them. Such an obligation would constitute a serious impediment to the dissemination of news and information guaranteed by the First and Fourteenth Amendments. *See Tilton v. Cowles Publishing Co.,* 76 Wn.2d 707, 723, 459 P.2d 8 (1969), *cert. denied,* 399 U.S. 927, 26 L. Ed. 2d 792, 90 S. Ct. 2238 (1970); *Mellor v. Scott Publishing Co.,* 10 Wn. App. 645, 660, 519 P.2d 1010 (1974). Indeed, as observed in *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), factual error is inevitable in the reporting of the news and limiting constitutional protection to only true statements would unduly inhibit reporting to only that which was certain and safe.

The only portion of the three news reports not directly taken from court documents is the statement which is attributed to the prosecutor's office and an investigator with the Department of Social and Health Services that

"the case is the largest Medicaid fraud ever uncovered in the state." Mark does not dispute that this statement was in fact made by the prosecutor's office and the agency investigator.[3] We need not decide whether statements attributed to investigators may be the basis for a news report and covered by the qualified privilege since here the statements made merely reiterated the material already of record in the proceedings. The news media must be free to publish information contained in official court records. *Cox Broadcasting Corp. v. Cohn, supra.* The pleadings, exhibits and affidavits before the trial judge identify no larger Medicaid fraud cases in this state. Neither Mark's pleadings nor his argument on appeal claim that a $200,000 Medicaid fraud would not be the largest such fraud uncovered in Washington. The basis of Mark's defamation claim is his assertion that he did not commit such a large Medicaid fraud. However, a plaintiff may not rely upon the bare allegation of falsity in his pleadings and upon speculation to carry the issue to trial. *See Brueggemeyer v. Associated Press,* 609 F.2d 825 (5th Cir. 1980); *Lundgren v. Kieren,* 64 Wn.2d 672, 393 P.2d 625 (1964); *Almy v. Kvamme,* 63 Wn.2d 326, 387 P.2d 372 (1963); *Dwinell's Central Neon v. Cosmopolitan Chinook Hotel,* 21 Wn. App. 929, 587 P.2d 191 (1978). The defendant acted reasonably in relying upon the contents of the documents which were matters of public record. The entry of a summary judgment of dismissal of the defamation action was appropriate.

---

[3]The authorities are roughly divided between including preliminary police reports and police records as judicial records, and including reports based on investigators' statements within the qualified privilege. *Gawel v. Chicago Am. Publishing Co.,* 1 Ill. App. 3d 481, 274 N.E.2d 628 (1971); *Stice v. Beacon Newspaper Corp.,* 185 Kan. 61, 340 P.2d 396, 76 A.L.R.2d 687 (1959); *Moritz v. Kansas City Star Co.,* 364 Mo. 32, 258 S.W.2d 583 (1953); *Turnbull v. Herald Co.,* 459 S.W.2d 516 (Mo. App. 1970); *Kilgore v. Koen,* 133 Ore. 1, 288 P. 192 (1930). On the other hand, the following cases held that reports based on police investigations were not privileged: *McAllister v. Detroit Free Press Co.,* 76 Mich. 338, 43 N.W. 431 (1889); *Hornby v. Hunter,* 385 S.W.2d 473 (Tex. Civ. App. 1964); *Lancour v. Herald & Globe Ass'n,* 111 Vt. 371, 17 A.2d 253, 132 A.L.R. 486 (1941).

PRIVACY ACTION

A person's protectable interest in privacy is invaded by: (a) unreasonable intrusion upon the seclusion of another or into his private affairs, or (b) appropriation of the other's name or likeness, or (c) unreasonable and unwanted publicity given to the other's private life or disclosure of embarrassing private facts, or (d) publicity that unreasonably places the other in a false light before the public. Restatement (Second) of Torts § 652A (1977); 3 J. Dooley, *Modern Tort Law* § 35.02 (1977). It has been acknowledged that the invasion of one's privacy is actionable in many states and that some states recognize a right of privacy as having a constitutional basis, while others hold that such a right is an equitable one. *Brink v. Griffith*, 65 Wn.2d 253, 396 P.2d 793 (1964); *Jeffers v. Seattle*, 23 Wn. App. 301, 597 P.2d 899 (1979); *State v. Adler*, 16 Wn. App. 459, 558 P.2d 817 (1976).

Mark alleges that the film clip aired by KING in conjunction with its January 7 news report resulted in an unreasonable intrusion into his seclusion and physical solitude. The contents of the film and the circumstances under which it was shot are sufficiently established by the uncontroverted portion of the parties' affidavits. We must review the material submitted for and against the motion for summary judgment in the light most favorable to the nonmovant. The film was shot by a KING cameraman from the exterior of Mark's pharmacy. The footage included shots of the exterior and interior as seen through the front window while the pharmacy was closed. The view of the interior included a view of an individual talking on the telephone. KING's affidavit states that the total length of the film was approximately 53 seconds, that the interior view of the pharmacy was approximately 13 seconds in length, and that the facial features of the individual within were not distinguishable. The news report contained in a later sequence film footage of Mark and his attorney in the county courthouse. Mark's version of the filming, set forth in his affidavit, is as follows:

> On December 31, 1976, my wife and I were in my pharmacy . . . visiting with a friend who had come by to see us that evening. The store was closed and locked. We were talking and drinking coffee when the phone rang. It was one of my children calling to tell me that a camera crew had been at our home asking for me. While I was still on the phone, a husky man with a shoulder–mounted camera came up the driveway area of the store, planted his camera against the front window, turned on powerful lights and started to photograph us. The lights were so bright I could not face the camera, and did not want to. I told my friend to go to the window and block out the camera's view, which he did, but the cameraman just moved aside and kept shooting; after taking pictures of the outside of the building and our outside store sign, he got in his car and left.
>
> . . .
>
> . . . The cameraman trespassed over 40 feet onto leased property. He had to walk up an inclined driveway for tenant parking, step up one step to a walkway, place his camera against the front window, focus and then begin to photograph.

Unlike Mark's assertion that the filming was accomplished by entry onto private property, KING's affidavit states that the filming was done on a public sidewalk. In any event, this factual dispute is of no consequence since the film was shot from the exterior of the building from a place that was open to the public.

■ Tort liability for invasion of privacy by intrusion upon seclusion is set forth in Restatement (Second) of Torts § 652B (1977):

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

This form of invasion of privacy is actionable only if the interference with a plaintiff's seclusion is a substantial one resulting from conduct of a kind that would be highly offensive and objectionable to the ordinary person.

Restatement (Second) of Torts § 652B, comment *d,* at 380 (1977).

The invasion or intrusion must be of something which the general public would not be free to view. Here, it is not contended that the film recorded anything other than that which any passerby would have seen passing the building, nor was the plaintiff portrayed in an unreasonable manner. The filming was accomplished without ruse or subterfuge. There is no reason to believe that a person of ordinary sensibilities would be offended by the film alone. *Dietemann v. Time, Inc.,* 449 F.2d 245 (9th Cir. 1971). It was not the film that put Mark in an embarrassing or compromising situation, but the fact that criminal charges had been filed against him. The adverse publicity arose because criminal charges had been brought against Mark, not because the news media chose to investigate an individual whose conduct was not a matter of legitimate public interest. W. Prosser, *Torts* § 118, at 825 (4th ed. 1971) says:

> Caught up and entangled in this web of news and public interest [are] a great many people who had not sought publicity, but indeed, as in the case of any accused criminal, [have] tried assiduously to avoid it. They [have] nevertheless lost some part of their right of privacy.

In *Berg v. Minneapolis Star & Tribune Co.,* 79 F. Supp. 957 (D. Minn. 1948), a photograph of the plaintiff in a courtroom was published by the defendant in conjunction with an account of the court proceedings in which the plaintiff was involved. The article accompanying the photograph accurately recounted the court proceedings and the photograph did not depict the plaintiff in an unreasonable manner. It was held that any invasion of privacy did not go beyond the bounds of the right of the media to disseminate a legitimate item of news. In *Jacova v. Southern Radio & Television Co.,* 83 So. 2d 34 (Fla. 1955), the film of a police raid on a cigar store included a view of the plaintiff who was innocently in the store at the time of the raid. The film did not depict the plaintiff as being arrested, although it

did show the plaintiff being questioned by two police officers. It was held that this was not an unreasonable or unwarranted invasion of the plaintiff's privacy. The film involved a newsworthy event and contained nothing which would embarrass or humiliate a person of ordinary sensibilities. In *Williams v. KCMO Broadcasting Div.–Meredith Corp.*, 472 S.W.2d 1, 56 A.L.R.3d 378 (Mo. App. 1971), the plaintiff was filmed as he emerged from a courthouse with his hands in the air after his arrest. The film also showed the plaintiff being searched with his hands against a police vehicle and being placed in the police vehicle. The film was broadcast in conjunction with a news report of the plaintiff's arrest and charges that were to be filed. It was held that the record did not demonstrate a cause of action for invasion of privacy. *See generally* Annot., 57 A.L.R.3d 16 (1974).

We conclude that the filming of the interior of Mark's pharmacy from outside the building, in conjunction with a legitimate news story, was neither an unreasonable nor an unwarranted intrusion upon Mark's seclusion.

Summary judgment was properly granted as to the privacy cause of action.

ANDERSEN, J., concurs.

SWANSON, J. (concurring in part; dissenting in part)—I concur in affirming dismissal of the defamation action but believe resolution of the critical question in the privacy cause of action—whether the alleged interference with plaintiff's seclusion is a substantial one resulting from conduct that would be highly offensive to a reasonable person—is an issue for the trier of fact. I therefore would dissent from affirming dismissal of the privacy action.

Reconsideration denied November 12, 1980.

Review granted by Supreme Court January 29, 1981.