IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33340-0-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL OBADIAH BATSELL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — After dismissing a charge of possession of methamphetamine against Daniel Batsell for an asserted *Brady*[1] violation, the trial court had second thoughts but doubted its authority to entertain a motion for reconsideration under CR 59. We need not determine whether CR 59 applies in order to entertain the State's appeal of the trial court's dismissal order. We reverse it; the appropriate remedy for the late discovery of information in this case was a trial continuance.

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

FACTS AND PROCEDURAL BACKGROUND

On September 15, 2014, Daniel Batsell was placed under arrest on outstanding warrants after he was encountered leaving a residence at 1107 West Yakima Street, to which Pasco police officers had traveled in response to a suspicious circumstances call. When Mr. Batsell was searched incident to the arrest by Officer Jeffrey Cobb, the officer found a broken glass pipe containing traces of methamphetamine in the pocket of his pants and a metal canister of methamphetamine in a small bag attached to a key chain he had been carrying. A set of car keys was on the key chain. Mr. Batsell was charged with possession of methamphetamine a couple of days later.

Mr. Batsell told his criminal defense lawyer that neither the car keys nor the associated car were his, so in the months before trial, Mr. Batsell's lawyer tried to identify the owner of cars at the residence at the time of his client's arrest. Mr. Batsell's lawyer shared information about what he was looking for with the prosecutor in October.

In January 2015, Mr. Batsell's lawyer told the prosecutor he had hired an investigator to try to find the owner of the car, who he believed was Mr. Batsell's friend and could testify that the car keys found in Mr. Batsell's possession did not belong to him. Mr. Batsell's lawyer asked the prosecutor for help locating the car's owner, but the prosecutor responded that he was unable to conduct a records search with the limited information provided and possessed no reports containing information about any vehicles. In February, Mr. Batsell informed the prosecutor that the pants in which the

2

glass pipe was found belonged to the same friend. The prosecutor again responded that he did not have any information in his file to help locate the friend.

On March 17, the day before trial, Mr. Batsell's lawyer e-mailed the prosecutor at 2:30 p.m., advising him that Mr. Batsell thought there should be police reports related to his case other than Officer Cobb's, which had been provided. The prosecutor received the e-mail upon returning to the office at 4:00 p.m. He immediately searched the law enforcement database for reports in which Mr. Batsell was named as an "involved other" and found one that had been prepared by Officer Richard Leininger and described the suspicious circumstances call that took police to the Yakima Street residence in the first place. Clerk's Papers (CP) at 19. It revealed that after Officer Cobb arrested Mr. Batsell, Officer Leininger contacted an individual named Joshua Ferris in the residence to which officers responded and arrested him. Because the report stated that Mr. Ferris identified Mr. Batsell as someone he knew and referred to the license plate number of a vehicle located at the residence, the prosecutor provided the report to Mr. Batsell's lawyer "within minutes." CP at 20.

The report disclosed that Mr. Ferris was at the Yakima Street residence and was the individual who had called police to report suspicious circumstances. He told the police dispatcher that a man named "Daniel Bates" was at the house earlier but had been asked to leave, and was acting funny. CP at 38. Mr. Ferris told the dispatcher he had armed himself with a shotgun while awaiting police.

3

Officer Leininger prepared the police report and was evidently the first to arrive at the Yakima Street residence, where he saw Mr. Batsell standing near a red car—identified in the report by license number—attempting to get into it. Officer Leininger ordered Mr. Batsell to get down; Mr. Batsell complied, and the report refers to the fact that Mr. Batsell had outstanding warrants. Officer Leininger turned Mr. Batsell over to Officer Cobb and Mr. Batsell's arrest was the subject matter of the separate police report prepared by Officer Cobb.

Officer Leininger's report went on to discuss what he did after turning Mr. Batsell over to Officer Cobb:

> I knocked on the door and contacted Ferris. Ferris opened the door and I noticed a shotgun that was disassembled and leaning near an old gun cabinet. Ferris was extremely paranoid and told me he thought someone was downstairs or in the room near the kitchen. The residence was littered with shotgun shells and used hypodermic needles.
> Ferris was detained for several warrants and the residence was cleared.
> Michelle Myer is apparently the homeowner, however she left the house before we arrived. While clearing the residence, a large gun safe was found downstairs in the house that contained several guns but was locked. There are several hundred rounds of ammunition in the residence and obvious signs of drug use including a broken meth pipe on the fridge.
> Ferris told me he thought that Daniel was trying to set him up because he is supposedly sleeping with another man's wife who lives in Finley. Ferris was sure people were out to get him, and the alarming thing is his attempts to load and assemble a shotgun while obviously high on Meth.
> Ferris was transported to FCCC for his warrants and Daniel was booked on possession of Meth.

CP at 39-40.

4

The morning after receiving Officer Leininger's report, Mr. Batsell's lawyer told the prosecutor that the defense theory was that Mr. Ferris had been high and paranoid and tried to set Mr. Batsell up. He asked the prosecutor to run the car's license plate to determine ownership, which was done, revealing the car was not Mr. Ferris's, but was instead owned by a Benjamin Freeman.

The same morning, at the outset of what was scheduled to be trial proceedings, Mr. Batsell's lawyer moved for dismissal of the charge or to continue the trial based on what he characterized as a *Brady* violation, telling the court the defense had been searching for Mr. Ferris since the beginning of the case. He explained that the defense theory was that Mr. Batsell borrowed Mr. Ferris's pants while helping Mr. Ferris move to a rehab facility, and had been carrying Mr. Ferris's keys to load some of Mr. Ferris's belongings into the red car. He argued that the fact that Mr. Ferris was under the influence of methamphetamine when contacted by Officer Leininger supported the theory that the methamphetamine belonged to Mr. Ferris. The lawyer explained that it was because Mr. Batsell only knew Mr. Ferris as "Joshua" that they had needed police assistance to locate him. Report of Proceedings (RP) (Mar. 18, 2015) at 2. He argued that Officer Leininger's report, "if not exculpatory," was "relevant in that it would lead [him] to be able to locate this witness and talk to him about these charges." *Id.* at 3.

The prosecutor responded that defense counsel had informed him that he was looking for someone named Joshua, but he understood defense counsel had an

5

investigator looking for the man. Until the final request on March 17, the prosecutor said he assumed the defense had located Joshua.

The trial court found a *Brady* violation and dismissed the charge.

Eight days later, the prosecutor moved for reconsideration, relying on CR 59. In addition to providing a supporting affidavit further explaining the history of his communication with defense counsel, he argued there had been no *Brady* violation because the government never withheld material information. He argued that a continuance, not dismissal, would have been the appropriate remedy.

The defense responded that CR 59 does not apply in criminal matters, and that the only remedy available to the prosecutor was to appeal the order of dismissal.

The trial court denied the motion to reconsider, explaining, "Primarily I'm not sure if I have the authority to do anything else." RP (Mar. 18, 2015) at 13. It added, "I will indicate if I had this information set forth in the way [the prosecutor] set [it] forth I may not have granted the dismissal at the time it happened. I didn't have it at the time." *Id.*

The State appeals.

## ANALYSIS

### *Appealability of* Brady *dismissal*

Mr. Batsell raises a threshold issue of whether the *Brady* dismissal was effectively appealed. The motion for reconsideration was not heard until May 4, 2015, and when it

6

was denied the State appealed denial of that motion. Mr. Batsell argues that appeal of the

reconsideration decision does not bring dismissal of the criminal charge up for review.

It is not entirely clear whether a CR 59 motion to reconsider is permitted in a

criminal case. On the one hand, in *Mark v. King Broadcasting Co.*, this court held that

"[w]here in a procedural area a civil rule speaks and a criminal rule is silent, the civil rule

applies." 27 Wn. App. 344, 349, 618 P.2d 512 (1980), *aff'd on other grounds*, 96 Wn.2d

473, 635 P.2d 1081 (1981), *cert. denied*, 457 U.S. 1124, 102 S. Ct. 2942, 73 L. Ed. 2d

1339 (1982). In 1988, our Supreme Court cited *Mark* with approval, and stated "the civil

rules can be instructive in matters of procedure for which the criminal rules are silent."

*State v. Gonzalez*, 110 Wn.2d 738, 744, 757 P.2d 925 (1988).

On other hand, in what appears to be the only published case that specifically

addresses CR 59's application in criminal cases, this court held that it does not apply.

*See State v. Keller*, 32 Wn. App. 135, 647 P.2d 35 (1982). It relied on the fact that, at the

time, "[r]elief from judgments and orders in both civil and criminal cases is governed by

CR 60(b), which supersede[d] RCW 4.72.010." *Id.* at 139. Several years after *Keller*,

however, CrR 7.8 was adopted, so CR 60(b) can no longer be said to apply to criminal

cases. The criminal rules are silent on the type of relief provided by CR 59. While not

expressly addressing the propriety of the procedure, at least two reported decisions in

criminal appeals have involved motions for reconsideration without questioning CR 59's

application in criminal cases. *See State v. Englund*, 186 Wn. App. 444, 459, 345 P.3d

7

859, *review denied*, 183 Wn.2d 1011, 352 P.3d 188 (2015); *State v. Chaussee*, 77 Wn. App. 803, 806-07, 895 P.2d 414 (1995).

We need not determine whether CR 59 applies, because we hold that the State's appeal presents the underlying *Brady* dismissal for our review. A timely motion for reconsideration extends the 30 day deadline for filing a notice of appeal otherwise provided by RAP 2.2(b)(4) to 30 days after entry of the order denying reconsideration. RAP 5.2(e). While RAP 5.2(e) requires that the CR 59 motion be "timely," it does not impose any other requirements as to its merits or viability. We liberally interpret the rules on appeal to "promote justice and facilitate the decision of cases on the merits," and because the State filed a timely motion for reconsideration, it was entitled to rely on the rule. RAP 1.2(a).

Mr. Batsell argues that the State's notice of appeal designated only the order denying reconsideration for review, however, and that RAP 2.4(c) provides that we review final judgments not designated in a notice of appeal of a timely decision on a CR 59 motion only where the order denies a "*posttrial* motion." (Emphasis added.) Because the *Brady* dismissal was a *pretrial* motion, he argues that RAP 2.4(c) does not permit review.

"General rules of statutory construction are employed in application and interpretation of rules promulgated by the Supreme Court, such as the Rules of Appellate Procedure." *State v. West*, 64 Wn. App. 541, 544, 824 P.2d 1266 (1992). That includes

8

determining the drafters' intent by examining an enactment as a whole and construing related rules together. *See id.* RAP 5.2(c) does not treat pretrial and posttrial motions for reconsideration differently in extending the time to appeal the underlying decision. Mr. Batsell offers no authority that holds (or any reasons we should hold) that orders on pretrial and posttrial motions can both be appealed following reconsideration, but if the notice of appeal designates the decision on reconsideration, then only decisions on posttrial motions are reviewable. A reported decision holds otherwise: in *Davies v. Holy Family Hospital*, 144 Wn. App. 483, 492, 183 P.3d 283 (2008), the underlying decision on a pretrial motion—a decision granting partial summary judgment—was deemed reviewable under RAP 2.4(c) notwithstanding that the underlying decision was not identified in the notice of appeal. Given a commonsense reading, RAP 2.4(c)'s reference to "posttrial motion[s]" simply reflects that fact that most CR 59 motions covered by the two rules will deal with underlying motions that were brought after trial. The trial court's order dismissing Mr. Batsell's criminal charge is before us for review.

### *Continuance, not dismissal, was the appropriate remedy*

The State contends the trial court erred when it dismissed the charge against Mr. Batsell under CrR 8.3(b), which authorizes trial courts to dismiss a criminal prosecution "due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." To succeed in such a motion, the defendant must prove both governmental misconduct and

9

prejudice to his right to a fair trial by a preponderance of the evidence. *State v. Rohrich,* 149 Wn.2d 647, 654, 71 P.3d 638 (2003). We review a trial court's decision to dismiss a criminal prosecution for abuse of discretion. *State v. Wilson,* 149 Wn.2d 1, 9, 65 P.3d 657 (2003).

The governmental misconduct alleged here was that the prosecutor suppressed Officer Leininger's police report in violation of *Brady,* which recognized an affirmative duty on the part of the State to disclose evidence that is favorable to a defendant. *Brady,* 373 U.S. at 87. An asserted *Brady* violation is reviewed de novo. *State v. Autrey,* 136 Wn. App. 460, 467, 150 P.3d 580 (2006).

The State makes viable arguments that no *Brady* violation occurred but this case is most easily resolved on the basis that the draconian remedy of dismissal under CrR 8.3(b) would be an abuse of discretion even if there was a *Brady* violation. At the time he made his motion, Mr. Batsell had received Officer Leininger's report and his own lawyer raised the possibility of a continuance as an alternative remedy.

*Brady* violations are most commonly raised after conviction as a basis for a new trial; they seldom warrant dismissal. The United States Court of Appeals for the District of Columbia has summarized the *postconviction* remedy analysis for a *Brady* violation as follows:

> (1) a *Brady* violation requires a remedy of a new trial; (2) such new trial
> may require striking evidence, a special jury instruction, or other additional
> curative measures tailored to address persistent prejudice; and (3) if the

10

lingering prejudice of a *Brady* violation has removed all possibility that the defendant could receive a new trial that is fair, the indictment must be dismissed. *To be sure, dismissal is appropriate only as a last resort, where no other remedy would cure prejudice against a defendant.*

*United States v. Pasha*, 797 F.3d 1122, 1139 (D.C. Cir. 2015) (emphasis added).

Our Supreme Court has held that "before a trial court should exercise its discretion to dismiss a criminal prosecution, a defendant must prove that it is more probably true than not true that (1) the prosecution failed to act with due diligence, and (2) material facts were withheld from the defendant until shortly before a crucial stage in the litigation process, which essentially compelled the defendant to choose between two distinct rights," those being the defendant's "'right to a speedy trial, or his right to be represented by counsel who has had sufficient opportunity to adequately prepare a material part of his defense.'" *State v. Woods*, 143 Wn.2d 561, 582-83, 23 P.3d 1046 (2001) (quoting *State v. Price*, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)).

This *Price/Woods* standard was not addressed by Mr. Batsell's lawyer when he moved for dismissal nor was it the standard applied by the trial court. It is doubtful that the State failed to act with due diligence. The information contained in Officer Cobb's police report did not mention Joshua, provide any identification of a car at the scene, or suggest that any other officer present either arrested someone else or would have had occasion to prepare an additional report. While Mr. Batsell's lawyer asked for help locating Joshua or the car, he did not inform the prosecutor until the day before trial that

11

his client believed there must be another police report, and the database consulted by the prosecutor contained hundreds of reports identifying Mr. Batsell as an "involved other." Once asked about another report, the prosecutor acted quickly to locate and provide it.

Even more clearly, the court never considered whether the State's actions had compelled Mr. Batsell to choose between his right to a speedy trial and the right to be represented by adequately prepared counsel.[2] No consideration was given to the amount of additional time his lawyer would need to prepare, having been provided with Mr. Ferris's name, and with the identities of the owner of the Yakima Street home and the red car. A trial court abuses its discretion if its decision rests on facts unsupported in the record or is reached by applying the wrong legal standard. *State v. Gentry*, 183 Wn.2d 749, 764, 356 P.3d 714 (2015).

The order of dismissal is reversed and the case remanded.

A majority of the panel has determined this opinion will not be printed in the

---

[2] At a hearing on January 20, defense counsel stated he was looking for a witness associated with the car and the keychain but was not asking to move the trial date because "I believe I can contact this person and get a statement from him and get a statement to [the prosecutor] regarding this matter." RP (Jan. 6, 2015) at 3. On February 3, he told the court "[w]e are actively trying to find two witnesses that were at the residence at the time this alleged offense occurred" but still expected to be ready for trial. *Id.* at 4.

12

No. 33340-0-III
*State v. Batsell*

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.