SAHARA GAMING CORPORATION, a Nevada Corporation, and SAHARA MISSION VALLEY, INC., a Nevada Corporation, Appellants, v. CULINARY WORKERS UNION LOCAL 226, Affiliated With HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION, AFL-CIO; and HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION AFL-CIO, Respondents.

No. 28555

August 27, 1999

984 P.2d 164

*Kirshman, Harris & Branton,* Las Vegas, for Appellants.

*McCracken, Stemerman, Bowen & Holsberry* and *Michael T. Anderson,* Las Vegas; *Thorndal, Backus, Armstrong & Balkenbush* and *Brian K. Terry,* Las Vegas, for Respondents.

# OPINION

By the Court, LEAVITT, J.:

This is a defamation and interference with contract case arising out of a labor dispute between non-party subsidiaries of appellants Sahara Gaming Corporation (Sahara Gaming) and Sahara Mission Valley (Sahara Mission) (collectively Sahara), and respondents, a labor union and its affiliates (collectively, the Union).

At the time of the labor dispute, Sahara Gaming was negotiating a multi-million dollar contract with Players International concerning a land sales and management agreement. The Union became aware of the negotiations and sent a letter to Players International asking it not to enter into a contract with Sahara Gaming. The letter accurately quoted a portion of a complaint filed in Mississippi which alleged that Sahara Gaming had committed fraud in another casino deal. Sahara alleges the Union republished the allegations presented in the complaint with full knowledge the statements were false and with the intent to cause harm to Sahara.

We must decide as a matter of law if a republication of a judicial proceeding constitutes an absolute privilege, when the statements are false or malicious and are republished with the intent to harm another. We hold the privilege is absolute.

Sahara Mission entered into a written agreement to sell real property to Players International for a sum in excess of $15,000,000.00. The agreement further provided Players International would pay Sahara Mission a management consulting fee of $2,900,000.00. In the letter to the Chairman and Chief Executive Officer of Players International the Union informed it that a "contentious labor dispute" existed between Sahara and the Union and that by "acquiring the Henderson property, Players is putting itself in the middle of this dispute." The letter further quoted from a complaint filed in a lawsuit in Mississippi involving Sahara and Treasure Bay Gaming & Resorts, Inc., wherein Sahara was being sued concerning a gaming management agreement, as follows:

> The representations Lowden made to Miller[1] to induce Miller to proceed with Lowden's plan and transfer his assets to Treasure Bay were false. At the time Lowden made the representations, neither he nor Sahara intended to staff Treasure Bay's casinos with experienced managers or experienced

---

[1]Lowden is Sahara's Chairman and Chief Executive Officer. Miller is Francis L. Miller, the founder and former Chairman and Chief Executive Officer of Treasure Bay.

marketing staff employed by Sahara. Nor did Lowden or Sahara intend to fulfill its duties as loyal agents in managing the Treasure Bay casinos. In addition, the budget projections Lowden and Sahara provided misrepresented the expenses Lowden and Sahara knew it would incur in opening the casinos.

Approximately two weeks after the letter was sent, Players International cancelled the management consulting agreement.

Sahara filed suit against the Union alleging that the Union republished Miller's statements in the complaint filed in the Mississippi action knowing they were false or with reckless disregard for the truth or falsity of the allegations. It further alleged the Union published the matter with "wrongful and willful intent to injure" Sahara. In addition Sahara filed claims for civil conspiracy, interference with contract, and interference with prospective economic advantage.

Union filed for summary judgment on the defamation and civil conspiracy claims; the district judge granted the motion and ordered summary judgment be entered on the two claims. The district judge reasoned as to the defamation claim that the letter accurately quoted the allegations contained in the Mississipi complaint in that it was a "fair and true recital" and "any person has a right to make a fair recital about a court case." As to the civil conspiracy claim, the court reasoned that it was derivative of the defamation claim and also granted summary judgment in favor of the Union on that cause of action. Subsequently, the district judge granted summary judgment in favor of the Union on the interference with contract and interference with prospective economic advantage claims on the ground that they, too, were derivative of the defamation claim.[2]

The purpose of summary judgment "is to avoid a needless trial when an appropriate showing is made in advance that there is no genuine issue of fact to be tried, and the movant is entitled to judgment as a matter of law." Coray v. Hom, 80 Nev. 39, 40-41, 389 P.2d 76, 77 (1964). "In determining whether summary judgment is proper, the nonmoving party is entitled to have the evidence and all reasonable inferences accepted as true." Wiltsie v. Baby Grand Corp., 105 Nev. 291, 292, 774 P.2d 432, 433 (1989) (citing Johnson v. Steel, Incorporated, 100 Nev. 181, 183, 678 P.2d 676, 677 (1984)). "Orders granting summary judgment are reviewed de novo." Bulbman, Inc. v. Nevada Bell, 108 Nev. 105,

---

[2]Although the dismissal of the interference with contract claims was presented to the district court upon a NRCP 12(c) motion, matters outside the pleadings were presented to the district court, and the motion was treated as one for summary judgment under NRCP 56. *See* NRCP 12(c).

110, 825 P.2d 588, 591 (1992) (citing Tore, Ltd. v. Church, 105 Nev. 183, 185, 772 P.2d 1281, 1282 (1989)).

There is no factual dispute here that the Union's letter was a fair and accurate report of the complaint in the Mississippi litigation; instead, Sahara is asserting that the report was made with malice and with intent to harm.

The law has long recognized a special privilege of absolute immunity from defamation given to the news media and the general public to report newsworthy events in judicial proceedings. Although the courts are open to the public, not everyone can attend hearings. The news media acts as an agent of the people to inform the public what transpires in the courtroom and to ensure the fairness of the proceedings. In exchange for this absolute privilege, comes the requirement and responsibility that the report be fair, accurate, and impartial. Opinions must be left to the editorial pages or editorial segments of television broadcasts.

Although the privilege is usually directed toward the news media and others engaged in reporting news to the public, it is not limited to republication by these publishers, but extends to any person who makes a republication of a judicial proceeding from material that is available to the general public. *See* Restatement (Second) of Torts § 611 cmt. c (1977). Here, the complaint was readily available for public inspection as a pleading in a judicial proceeding.

This court first set forth the rule prior to the turn of the century when it stated in Thompson v. Powning, 15 Nev. 195, 203 (1880), the following:

> A fair and impartial account of the proceedings in a court of justice is, as a general rule, a justifiable publication. Proprietors of newspapers are not to be punished for publishing a fair, full, and true report of judicial proceedings, except upon actual proof or [sic] malice in making the report. The reason for this rule is, that the public have [sic] a right to know what takes place in a court of justice, and unless the proceedings are of an immoral, blasphemous, or indecent character, or accompanied with defamatory observations or comments, the publication is privileged.

(Citations omitted.)

This early ruling seems to grant only a conditional privilege; if the report is made with actual malice or accompanied with defamatory opinions, the privilege is abused and lost. However, this court later established a new absolute privilege rule. The court held that defamatory matter published from a judicial proceeding is absolutely privileged "provided the answers of the witness are

relevant and pertinent to the subject of inquiry, *whether or not they are false or malicious.*" Nickovich v. Mollart, Et Al., 51 Nev. 306, 313, 274 P. 809, 810 (1929) (emphasis added). The court later extended the absolute privilege to quasi-judicial proceedings saying, "By granting an absolute privilege to statements made before a quasi-judicial body, the right of individuals to express their views freely upon the subject under consideration is protected." Knox v. Dick, 99 Nev. 514, 518, 665 P.2d 267, 270 (1983).

This court reaffirmed the absolute privilege rule in Circus Circus Hotels v. Witherspoon, 99 Nev. 56, 60, 657 P.2d 101, 104 (1983), wherein we stated:

> [There] is [a] long-standing common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of controversy. The absolute privilege precludes liability even where the defamatory statements are published with knowledge of their falsity and personal ill will toward the plaintiff.

(citations omitted) (referring to NRS 612.265(7)[3] in which the rule has been codified as to communications from an employer as to the Employment Security Division pursuant to Chapter 612). This court further explained as follows: "The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." *Id.* at 61, 657 P.2d at 104 (citing Ducosin v. Mott, 642 P.2d 1168, 1170-71 (Or. 1982)); *see Knox,* 99 Nev. at 517-18, 665 P.2d at 270. This court further stated, "On the basis of this policy, the absolute privilege attached to judicial proceedings has been extended to quasi-judicial proceedings before executive officers, boards, and commissions, including proceedings in which the administrative body is considering an employee's claim for unemployment compensation." *Id.* at 61, 657 P.2d at 104 (citing Krenek v. Able, 594 S.W.2d 821, 823 (Tex. Civ. App. 1980)).

In a claim for defamation and intentional infliction of emotional

---

[3]This provision has been renumbered as NRS 612.265(12) and now reads as follows:

> All letters, reports or communications of any kind, oral or written, from the employer or employee to each other or to the **division** [employment security department] or any of its agents, representatives or employees are privileged and **must** [shall] not be the subject matter or basis for any lawsuit if the letter, report or communication is written, sent, delivered or prepared pursuant to the requirements of this chapter.

New wording is noted in bold and prior wording is in brackets.

distress, this court extended the absolute privilege rule to occasions where a citizen files a complaint with an internal affairs bureau against a police officer. We stated, "The extension of the privilege promotes the public's interest by allowing civilian complaints against public officials to be aired in the proper forum without fear of civil liability." Lewis v. Benson, 101 Nev. 300, 301, 701 P.2d 751, 752 (1985) (citing Campo v. Rega, 433 N.Y.S.2d 630, 631 (App. Div. 1980)). This court concluded, "Thus, the application of an absolute privilege to civilians filing complaints with an internal affairs bureau sufficiently promotes the interest of the public to warrant the availability of an absolute privilege." *Id.* at 301, 701 P.2d at 752.

Additionally, defamatory statements made by an attorney during a medical malpractice case were absolutely privileged when the attorney referred to the defendant doctor as "incompetent, a fumble-fingered fellow, a liar, a scoundrel, a damned idiot." Bull v. McCuskey, 96 Nev. 706, 708, 615 P.2d 957, 961 (1980), *overruled on other grounds by* Ace Truck v. Kahn, 103 Nev. 503, 746 P.2d 132 (1987). The attorney also said of the doctor, "[h]e will lie under oath, steal an elderly woman's redress, cheat if he can get away with it, and all that is left for him is to make a pact with the devil and murder those who would oppose him." *Id.* at 708-09, 615 P.2d at 961. This court said, "As a general proposition an attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." *Id.* at 711-12, 615 P.2d at 961 (quoting Restatement (Second) of Torts § 586 (1977)); *see* Richards v. Conklin, 94 Nev. 84, 84-85 575 P.2d 588, 589 (1978). This court reasoned that the statements "may be understood to pertain to either the doctor's competence or his credibility, and therefore, are privileged." *Id.* at 712, 615 P.2d at 961. This court further reasoned, "The privilege rests upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to obtain justice for their clients." *Id.* The court did not condone the statements, however, and said, "[A]lthough the denigrative comments of attorney Bull regarding the doctor were privileged, and alone would not supply a basis for liability in damages, it does not follow that an attorney may so conduct himself without fear of discipline." *Id.* The court then pointed out the attorney's oath and standards of conduct under the Supreme Court Rules could subject him to discipline. *Id.,* 615 P.2d at 962.

This court has also held that the absolute privilege rule applies to letters written in anticipation of litigation. Specifically such let-

ters are "subject to both an absolute and qualified privilege." *Richards,* 94 Nev. at 85, 575 P.2d at 589 (citing Romero v. Prince, 513 P.2d 717, 719-20 (N.M. App. 1973)).

Thus, we have recognized the absolute privilege rule as to communications uttered or published in the course of judicial proceedings and extended the privilege to quasi-judicial hearings, complaints filed with an internal affairs bureau against a police officer, and even letters written in anticipation of litigation. Certainly, the pleading in this case, a formal complaint, is covered under the rule of absolute privilege.

Other jurisdictions have adopted the rule: "The general rule is that allegations in pleadings made in the course of judicial proceedings are absolutely privileged if they bear a reasonable relationship to the subject of the action." Shipley v. Howard, 519 P.2d 1230, 1231 (Colo. Ct. App. 1974). Defamatory statements contained in pleadings are absolutely privileged if they are relevant to the subject of inquiry. *See* Bailey v. Superior Court, Etc., 636 P.2d 144, 146 (Ariz. Ct. App. 1981) (citing Sierra Madre Dev., Inc. v. Via Entrada Town. Ass'n, 514 P.2d 503, 506-07 (Ariz. Ct. App. 1973)). "[D]efamatory matter in judicial pleadings, even if false and malicious, is absolutely privileged" when "reasonably related" to the matter involved. Stryker v. Barbers Super Markets, Inc., 462 P.2d 629, 631 (N.M. Ct. App. 1969); *see accord* Neece v. Kantu, 507 P.2d 447, 452 (N.M. Ct. App. 1973). "Pleadings are absolutely privileged" and "existence of malice . . . cannot support a claim for defamation." Gem Trading Co., Inc. v. Cudahy Corp., 603 P.2d 828, 832 (Wash. 1979). "Absolute immunity [is granted] to all statements made in the course of, or incidental to, a judicial proceeding, so long as they are relevant to the proceedings." Vasquez v. Courtney, 557 P.2d 672, 673 (Or. 1976) (citing Ramstead v. Morgan, 347 P.2d 594, 596 (Or. 1959)). Publications made in the course of judicial proceedings are absolutely privileged. *See* Albertson v. Raboff, 295 P.2d 405, 409 (Cal. 1956), *partially abrogated by* Cal. Civ. Code. § 47(b) (West 1999). "Defamatory words, published by parties, counsel or witnesses in the course of a judicial procedure" and which are "connected with, or relevant or material to, the cause in hand or subject of inquiry," constitute an absolutely privileged communication, and "no action will lie therefor, however false or malicious they may in fact be." Hammett v. Hunter, 117 P.2d 511, 512 (Okla. 1941).

On the question of the relevancy requirement, this court has concluded, "[T]he test of relevancy is very broad. The defamatory material need not be relevant in the traditional evidentiary sense, but need have only 'some relation' to the proceeding; so long as the material has some bearing on the subject matter of the

proceeding, it is absolutely privileged." *Circus Circus,* 99 Nev. at 61, 657 P.2d at 104 (quoting Restatement (First) of Torts § 587 (1938)).

Since the Union's alleged defamatory statements were a fair and accurate report of a judicial proceeding, they are absolutely privileged, and the material recited will not support a defamation suit even if the statements were made maliciously and with knowledge of their falsity. This has been the policy and rule in Nevada for the last seventy years and the privilege includes administrative hearings, quasi-judicial proceedings as well as judicial actions. It is in the public's interest to have litigants speak freely in pleadings and while testifying during a trial or hearing without fear of civil liability. It is the news media and public's right to know what transpires in the legal proceedings of this state and that is paramount to the fact someone may occasionally make false and malicious statements. It is the court or administrator's function to search out and find the truth in all litigation.

The district court ruled correctly in granting summary judgment for the Union.

Sahara also filed claims for interference with contract, civil conspiracy, and interference with prospective economic advantage but concedes if the defamatory statements are privileged, then those claims are derivative of the defamation claim or are subject to federal preemption.

Accordingly, we affirm the district court's orders granting summary judgment.[4]

Sullivan, D. J., concurs.

Shearing, J., with whom Agosti, J., joins, concurring:

I agree that the order granting summary judgment should be affirmed. However, I do not agree with the majority's analysis of this court's prior caselaw and would not adopt the Restatement position in its totality.

The Nevada cases cited by the majority hold that testimony or reports in judicial and quasi-judicial proceedings are absolutely privileged, even if made with malice. Knox v. Dick, 99 Nev. 514, 665 P.2d 267 (1983); Circus Circus Hotels v. Witherspoon, 99 Nev. 56, 657 P.2d 101 (1983); Nickovich v. Mollart, 51 Nev. 306, 274 P. 809 (1929). However, none of these cases hold that *republication* of statements in such proceedings are absolutely privi-

---

[4]The Honorable Jerry V. Sullivan, Judge of the Sixth Judicial District Court, was designated by the Governor to sit in place of The Honorable A. William Maupin, Justice. Nev. Const. art. 6, § 4.

leged. This court, as early as 1880, in Thompson v. Powning, 15 Nev. 195, 203 (1880), recognized a conditional privilege for republication of a "fair, full, and true report of judicial proceedings." The reason for the privilege was the same in 1880 as it is now, namely, "that the public have a right to know what takes place in a court of justice . . ." *Id.* Truth was a justification under this common law privilege, but even proof of lack of malice in the republication of a falsity was held only to mitigate exemplary damages, not actual damages. *Id.* at 207.

The Restatement (Second) of Torts § 611 (1977) provides:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

The comments to Section 611 of the Restatement make clear that the privilege is absolute if the report is a fair and accurate report of the official action or proceeding. *Id.* at cmt. a. The truth or knowledge of the reporter is irrelevant as long as the report is fair and accurate. I agree we should adopt the Restatement position that the fair report privilege is absolute for reports of official proceedings which are accurate and complete or a fair abridgement of the occurrence reported.

However, I do not agree with a limitation which the Restatement places on the fair report privilege. The Restatement takes the position that the privilege applies only to official actions, not to preliminary pleadings, such as a complaint or petition, before any judicial action is taken. *Id.* at cmt. e. I would hold that the fair report privilege applies to republication of all public records of judicial cases, whether or not any judicial action has been taken. The view in England and the majority view in America until the early part of this century was that the common law privilege applied only after there was judicial action. Rodney A. Smolla, *Law of Defamation* § 8.10[2][a][ii] (1998). That is no longer the majority view in this country. *Id.* The more modern view is that a lawsuit from beginning to end is in the nature of a judicial proceeding and that a pleading is a public act in the course of judicial proceedings. *Id.* The leading case on this issue is Campbell v. New York Evening Post, 157 N.E. 153 (N.Y. 1927), in which Judge Roscoe Pound cited, among other examples, the incongruity of the republication of ex parte orders being privileged, but not complaints, when there is no rational basis for a distinction. Judge Pound stated:

> The present distinction is indefensible. Therefore we proceed to a logical conclusion, and uphold the claim of privilege on

the ground that the filing of a pleading is a public and official act in the course of judicial proceedings.

*Id.* at 156.

Further, I do not agree with the dissenting justices that the basis for the fair report privilege as to pleadings is that pleadings are presumed to be accurate and reliable. I believe the basis for the privilege is that the public is entitled to know what is in the public record. In Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 495 (1975), the United States Supreme Court held that a state is precluded from imposing civil liability based upon the publication of truthful information contained in official records open to public inspection. Although the holding may not be directly applicable here, the language of the Supreme Court opinion is instructive. In the opinion of the Court, Justice White stated:

> By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

*Id.* at 495. The mischief perpetrated by a scheme to file false pleadings merely to publish lies with impunity is far less than the mischief perpetrated by denying the public access to official court pleadings.

In this case there is no dispute that the respondents accurately quoted the officially filed complaint. Therefore, I agree that summary judgment was appropriately granted.

ROSE, C. J., with whom YOUNG, J., agrees, concurring:

I concur because I do not think that the pleadings and affidavits filed in this case create a triable issue of fact, but I disagree with the majority's legal analysis of the fair report privilege.

This is not a case about gaming in Nevada. The issues do not involve labor law—it is a case of libel. The majority turns the traditional concepts of the law of libel upside down by granting an absolute privilege to reprint *any* portion of documents filed in

court, even if reprinted with malice and with knowledge that the information is false. The element of fairness in the fair report privilege is removed by the majority opinion, and therefore I disagree with the majority's grant of an absolute fair report privilege.

The fair report privilege was recognized at a time when there was a legitimate expectation that court documents would be accurate and reliable. *See* Thompson v. Powning, 15 Nev. 195 (1880). Beginning in 1927, the fair report privilege was expanded to cover all pleadings filed with a court. *See* Reader's Digest Ass'n v. Superior Ct., 690 P.2d 610 (Cal. 1984); Cox v. Lee Enter., Inc., 723 P.2d 238 (Mont. 1986); Campbell v. New York Evening Post, 157 N.E. 153 (N.Y. 1927); Ala. Code § 13A-11-1161 (1992); Ky. Rev. Stat. Ann. § 411.060 (Banks-Baldwin 1994); Ohio Rev. Code Ann. § 2317.05 (Anderson 1995). However, there is still a minority of states that refuse to extend the privilege to pleadings because they recognize that pleadings often contain false or misleading charges filed for malicious reasons. *See* Sanford v. Boston Herald-Traveler Corp., 61 N.E.2d 5 (Mass. 1945); *see also* Restatement (Second) of Torts § 611 cmt. e (1977) (republication of pleadings not privileged because no judicial action taken).

Like the minority of states, I find the premise upon which the fair report privilege is based—that all court documents are factually reliable—to be questionable in today's society. We have seen lawsuits with extravagant claims filed for political or strategic purposes, and I would not guarantee the veracity of some of the allegations I have seen or read about in various pleadings. But aside from the dubious premise upon which the fair report privilege is based, I believe that the absolute privilege the majority espouses today may lend itself to much mischief.[1]

According to the majority, a privileged occasion arises even when the publisher believes or knows the information published is false, and publishes the information maliciously with the intent to harm. The majority's absolute privilege is dangerously broad and protects any declarant who reports to inform the public that the defamed person was a miserable individual, or to influence an

---

[1]My concurring colleague, JUSTICE SHEARING, contends that the fair report privilege should be extended to pleadings because the public is entitled to know what is in the public record and more mischief would be perpetrated by denying the public access to court pleadings. I agree with my concurring colleague that the public has the right to know what is in the public record, but note that refusing to extend the fair report privilege to pleadings would in no manner limit the public's access to pleadings filed in our courts. Rather, limiting the fair report privilege to court proceedings would merely serve to hold individuals accountable for maliciously publishing information in pleadings that they knew or should have known was false. In our state, citizens should not only have the right to public information, but also the right to compensation for damages suffered when a publisher reprints public information that the publisher knew or should have known was false.

election, even if the declarant knows the published information is false.

To balance this privilege and make it truly conditional, I would declare that a publisher loses the protection of the fair report privilege if he or she publishes a statement with actual malice—when he or she knew or should have known that the statement was false.[2] The First Amendment does not and should not be contorted to protect malicious liars merely because the lies were contained within the context of a judicial action. The Supreme Court of Pennsylvania eloquently described the ramifications of granting an absolute privilege to members of the media:

> The defendant makes the startling statement in its brief that "even if defendant had known plaintiff was innocent and not a racketeer the broadcast would still be privileged." *This argues that because one is engaged in the business of news-dispensing, he may circulate a statement which he knows to be utterly false, to the irreparable injury of the innocent person. This would make legal tender of falsehood, give dignity to mendacity and make character assassination respectable.* There is nothing in the laws of our country, and certainly not in the precepts of this nation which would give approval to so utterly immoral a standard of conduct. As the distinguished Justice Paxson cogently stated it in the case of Briggs v. Garrett, 111 Pa. 404, 414, 2 A. 513, 520;

> "A lie is never privileged. It always has malice coiled up within it. When a man coins and utters a lie, or when he repeats it knowing it to be false, the law implies malice, and he cannot shelter himself behind the doctrine of privileged communications."

Purcell v. Westinghouse Broadcasting Co., 191 A.2d 662, 669-70 (Pa. 1963) (emphasis added). Moreover, a conditional fair report privilege is in accord with defamation/libel law principles that grant protection to those who reprint false or misleading court documents in good faith, without the primary intent to harm the allegedly defamed person.

Although I disagree with the majority's grant of an absolute fair report privilege, I concur with its decision to affirm the order granting the Union's summary judgment motion. I concur with its

---

[2] I note that there are numerous jurisdictions where the fair report privilege is conditional and where it may be lost if the plaintiff demonstrates that the defendant acted with common law or actual malice. *See* D'Alfonso v. A.S. Abell Co., 765 F.2d 138 (4th Cir. 1985); Schiavone Constr. Co. v. Time, Inc., 735 F.2d 94 (3d Cir. 1984); Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70 (W. Va. 1983); Mark v. King Broadcasting Co., 618 P.2d 512 (Wash. Ct. App. 1980).

decision because the affidavit submitted by Sahara did not create a triable issue of material fact. *See* Posadas v. City of Reno, 109 Nev. 448, 452, 851 P.2d 438, 441 (1993) ("the non-moving party must, by affidavit or otherwise, set forth specific facts demonstrating the existence of genuine issue for trial"). This affidavit created no triable material issues because it contained no affirmations that the Union acted with malice or knew or should have known that the information it reproduced from the Mississippi complaint was false. Accordingly, the instant case should be affirmed as Sahara's affidavit was insufficient to raise a triable issue of material fact.

Although I concur that the instant case should be affirmed, I disagree with the majority's conclusion that the union's letter was absolutely privileged. I believe that this court should adopt a fair report privilege that is truly conditional, a privilege that is lost when one publishes maliciously. After all, the privilege is a "fair report" privilege—not an "all report" privilege. The fair report privilege is a shield, in that it protects free speech. In this case, however, the majority takes the shield and fashions it into a sword, allowing the fair report privilege to be used as a weapon. The majority legitimizes those who publish information with the knowledge that it was false and with the intent to harm. I believe that this broad rule will permit unfair play in the future and it is contrary to the basic principles of the law of libel.

BECKER, J., concurring:

I concur with the decision of the majority to affirm the order granting summary judgment because I do not believe the Union had actual knowledge that the statements made in the Mississippi action were false. The pleadings and affidavits do not establish a "genuine issue of material fact," nor do they demonstrate that additional discovery is likely to produce such evidence.

I disagree with the majority's holding that the fair reporting privilege should be absolute and unconditional. I believe the privilege should be conditional as to the general public and absolute when applied to the press. If an individual has actual knowledge that information contained in a legal pleading is false and then reports that information with the intent to harm another, then such a person should be subject to an action in defamation.

Under the majority's analysis, it is now permissible for individuals to file lawsuits containing false statements, arrange for the republication of those statements under the fair reporting privilege, and avoid the consequences of a defamation action.

I agree with JUSTICE SHEARING that the privilege should be absolute for representatives of the press. If a conditional privilege applied to members of the news media, they would be subject to

the cost and expense of defending a lawsuit until it was clear that the plaintiff could not prove that the press had actual knowledge that the information contained in the judicial proceeding was false. This is too great a burden to place upon the members of the fourth estate. The benefit gained by having the press report upon judicial proceedings outweighs the harm that could result from one reporter abusing the privilege for profit.