133 Nev., Advance Opinion 67

IN THE SUPREME COURT OF THE STATE OF NEVADA

SHELDON G. ADELSON,
Appellant,
vs.
DAVID A. HARRIS; MARC R.
STANLEY; AND NATIONAL JEWISH
DEMOCRATIC COUNCIL,
Respondents.

No. 67120

**FILED**

SEP 27 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Certified questions pursuant to NRAP 5 regarding whether Nevada's fair report privilege or anti-SLAPP statute immunize an online petition sponsor from civil liability. United States Court of Appeals for the Second Circuit; Guido Calabresi, Reena Raggi, Denny Chin, Second Circuit Judges.

*Questions answered.*

Lewis Roca Rothgerber Christie LLP and Daniel F. Polsenberg, Las Vegas; Morris Law Group and Steve L. Morris and Rosa Solis-Rainey, Las Vegas, for Appellant.

Campbell & Williams and Donald J. Campbell and J. Colby Williams, Las Vegas; Levine Sullivan Koch & Schulz, LLP, and Seth D. Berlin and Lee J. Levine, Washington, D.C., for Respondents.

McDonald Carano Wilson LLP and Kristen T. Gallagher and Pat Lundvall, Las Vegas; Davis Wright Tremaine LLP and Laura R. Handman, Washington, D.C., for Amici Curiae The Association of American Publishers, Inc.; Bloomberg L.P., d/b/a Bloomberg News; CBS Broadcasting, Inc.; CBS Corporation; The Daily Beast Company LLC; E.W. Scripps Company; First Look Media, Inc.; IAC/InterActiveCorp; The Media Law Resource Center; Nash Holdings LLC; National Public Radio, Inc.; NBCUniversal Media, LLC; The Nevada Press Association; The Reporters Committee for Freedom of

17-32838

the Press; TDB Holdings, Inc.; Reuters America LLC; WP Company LLC, d/b/a The Washington Post.

BEFORE THE COURT EN BANC.[1]

*OPINION*

By the Court, HARDESTY, J.:

The United States Court of Appeals for the Second Circuit certified to this court, and we accepted, two questions of law pursuant to NRAP(5):

> Does a hyperlink to source material about judicial proceedings in an online petition suffice to qualify as a report for purposes of applying the common law fair report privilege?

> Did Nevada's anti-strategic litigation against public participation ("anti-SLAPP") statute, NRS 41.653-.670, as that statute was in effect prior to the most recent amendments in 2013, cover speech that seeks to influence an election but that is not addressed to a government agency?

*Adelson v. Harris*, Docket No. 67120 (Order Accepting Certified Questions, Directing Briefing, and Directing Submission of Filing Fee, March 19, 2015). As to the first question, we conclude that a hyperlink to source material about a judicial proceeding may suffice as a report within the common law fair report privilege.

---

[1]Chief Justice Michael Cherry and Justice Kristina Pickering are disqualified from this case.

 

As to the second question, we refer the circuit court to our recently published opinion in *Delucchi v. Songer*, 133 Nev., Adv. Op. 42, 396 P.3d 826, 830 (2017), which explains that application of Nevada's anti-SLAPP statute, prior to the 2013 amendment, is not limited to communication addressed to a government agency, but includes speech "aimed at procuring any governmental or electoral action."

*FACTS AND PROCEDURAL HISTORY*

During the 2012 presidential election cycle, respondents the National Jewish Defense Counsel, its chair Marc Stanley, and its CEO Davis Harris (collectively, NJDC) posted an online petition to pressure presidential candidate Mitt Romney to reject appellant Sheldon Adelson's campaign contributions. The petition indicated that Adelson had "reportedly approved of prostitution" at his Macau casinos and included a hyperlink to an Associated Press (AP) article discussing ongoing litigation from Nevada that involved Adelson and Steven Jacobs, the former CEO of Adelson's casinos in Macau. The AP article provided a summary of a sworn declaration Jacobs filed in the litigation alleging that Adelson had approved of prostitution in his Macau casino resorts. Specifically, the article quotes a portion of the declaration in which Jacobs states that a "prostitution strategy had been personally approved by Adelson."

The petition was approximately one page long. The top half of the petition was composed of a large graphic stating: "IF ONE OF YOUR BIGGEST DONORS WAS ACCUSED OF PUTTING 'FOREIGN MONEY' FROM CHINA IN OUR ELECTIONS & REPORTEDLY APPROVED OF PROSTITUTION, WOULD YOU TAKE HIS MONEY?" Below this graphic were four paragraphs of regular text. The AP article's hyperlink was in the petition's second paragraph. The hyperlink was approximately three-fourths of the way down the page, and was placed on the words

SUPREME COURT
OF
NEVADA

(O) 1947A

"personally approved." There were at least three other working hyperlinks in the petition, which were connected to partisan news articles. The sentence that included the operative hyperlink read as follows: "But this week, reports surfaced that in addition to his <u>anti-union</u> and allegedly <u>corrupt business practices</u>, **Adelson 'personally approved' of prostitution in his Macau casinos**." (Underlines represent active hyperlinks at the time the petition was published.)

Based on the petition, Adelson filed a defamation action against the NJDC. In his complaint, Adelson alleged that "[t]he gist of the . . . [petition] is that the political contributions made by Adelson were 'tainted,' 'dirty' money obtained from Mr. Adelson's having 'personally approved of prostitution in his Macau casinos.'" Thus, Adelson argued that "[t]he gist of the [petition] . . . [was] false and defamatory."

The United States District Court for the Southern District of New York determined that Nevada law governed the controversy and dismissed Adelson's complaint, concluding that the prostitution comment constituted a privileged report of judicial proceedings and that the state's anti-SLAPP statutes applied. *Adelson v. Harris*, 973 F. Supp. 2d 467, 471 (S.D.N.Y. 2013). Adelson appealed to the Second Circuit, which certified the two questions of law stated above.

## DISCUSSION

The Second Circuit's first certified question focuses on whether a hyperlink to a news article discussing litigation, itself covered by the common law fair report privilege, suffices to render the petition a privileged fair report. *Adelson v. Harris*, 774 F.3d 803, 808 (2d Cir. 2014). The question requires this court to determine when the fair report privilege can protect an Internet communication that draws information from an underlying report of judicial proceedings available to the public.

Supreme Court
OF
Nevada

(O) 1947A

4

Nevada "has long recognized a special privilege of absolute immunity from defamation given to the news media and the general public to report newsworthy events in judicial proceedings." *Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 115 Nev. 212, 214, 984 P.2d 164, 166 (1999); *see also Circus Circus Hotels, Inc. v. Witherspoon*, 99 Nev. 56, 60, 657 P.2d 101, 104 (1983) ("[There] is [a] long-standing common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of controversy." (citation omitted)). "[T]he 'fair, accurate, and impartial' reporting of judicial proceedings is privileged and nonactionable . . . affirming the policy that Nevada citizens have a right to know what transpires in public and official legal proceedings." *Lubin v. Kunin*, 117 Nev. 107, 114, 17 P.3d 422, 427 (2001) (quoting *Sahara Gaming*, 115 Nev. at 215, 984 P.2d at 166).

Although the fair report privilege is most commonly asserted by media defendants, it "extends to any person who makes a republication of a judicial proceeding from material that is available to the general public." *Sahara Gaming*, 115 Nev. at 215, 984 P.2d at 166. In Nevada, if the privilege applies, it is "absolute," meaning it "precludes liability even where the defamatory statements are published with knowledge of their falsity and personal ill will toward the plaintiff." *Circus Circus Hotels*, 99 Nev. at 60, 657 P.2d at 104; *see also Sahara Gaming*, 115 Nev. at 213, 984 P.2d at 165.

*Determining when a document, which draws upon a source summarizing judicial proceedings, falls within the fair report privilege*

The primary test to resolve whether a report qualifies for the fair report privilege was articulated by the United States Court of Appeals for the Federal Circuit in a case interpreting the District of Columbia's

Supreme Court
of
Nevada

(O) 1947A

5

fair report privilege. *See Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985); *see also* David Elder, *Defamation: A Lawyer's Guide* § 3:3 (2015) (stating that *Dameron* "has become the leading case" on what constitutes a report). In *Dameron*, the court considered whether an allegedly defamatory statement in a magazine article should be immunized under the fair report privilege. 779 F.2d at 737. The allegedly defamatory statement was based on the conclusion reached in a National Transportation Safety Board (NTSB) report. *Id.* at 740. However, nothing in the vicinity of the article's statement mentioned the NTSB report. *Id.* The court explained the fair report privilege's purpose and articulated the following rule:

> The privilege's underlying purpose—encouraging the dissemination of fair and accurate reports— also suggests a natural limit to its application. . . . The privilege is . . . unavailable where the report is written in such a manner that the average reader would be unlikely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding. It must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings.

*Id.* at 739. The court concluded that neither the overall context nor specific attributions allowed an average reader to determine the publication's statement was based on the NTSB report. *Id.* at 740.

The *Dameron* test reflects Nevada's policy that citizens have a right to a fair account of what occurs during official proceedings. *See, e.g.,* *Lubin*, 117 Nev. at 114, 17 P.3d at 427. By focusing on the average reader and specific attributions or overall context, the test also properly asks whether an average Nevada citizen can understand that the report is

SUPREME COURT
OF
NEVADA

(O) 1947A

summarizing an official document or proceedings. For these reasons, we adopt the *Dameron* test and consider the petition's specific attributions to determine whether the AP hyperlink is sufficient to bring the petition within the fair report privilege as a matter of law on the record before us.

*The hyperlink provides sufficient attribution to turn the petition into a privileged fair report*

At the outset of our discussion, we note that Adelson has conceded that the underlying AP article quoting Jacobs' declaration itself is protected by the fair report privilege. Thus, we must consider, as an issue of first impression, whether a hyperlink in an Internet publication that provides specific attribution to a document protected by the fair report privilege qualifies as a protected report for purposes of that privilege.

Under *Dameron*, specific attributions may sufficiently reference underlying sources to bring a document within the fair report privilege, even if the overall context fails to do so.[2] 779 F.2d at 739. When a specific attribution makes it apparent to an average reader that a document draws from judicial proceedings, it will be immune from civil liability. *Id.*

"A hyperlink, or a link, is a 'cross-reference . . . appearing on one [W]eb page that, when activated by the point-and-click of a mouse, brings onto the computer screen another [W]eb page.'" Anjali Dalal, *Protecting Hyperlinks and Preserving First Amendment Values on the Internet*, 13 U. Pa. J. Const. L. 1017, 1018 (2011) (alterations in original)

---

[2]In light of our decision that the petition's specific attributions bring the petition within the fair report privilege, we need not address the overall context of the petition.

 

(quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 455 (2d Cir. 2001)). Hyperlinks "are the signature characteristic of the World Wide Web . . . [and] [b]oth creation and use of hyperlinks are relatively simple tasks." Mark Sableman, *Link Law Revisited: Internet Linking Law at Five Years*, 16 Berkeley Tech. L.J. 1273, 1276 (2001). "On an individual level, hyperlinks can help readers understand an issue in depth; can provide an element of interactivity for the reader[;] and can also increase the user's ability to control the information-seeking process." Porismita Borah, *The Hyperlinked World: A Look at How the Interactions of New Frames and Hyperlinks Influence News Credibility and Willingness to Seek Information*, 19 J. of Computer-Mediated Comm. 576, 579 (2014) (citations and internal quotation marks omitted). Hyperlinks provide strong attribution because they allow direct access to underlying materials, are intuitively easy to use, and are extremely prevalent online. A reader can click on a hyperlink and immediately determine whether official proceedings are implicated.

Here, the AP article, which connected with the hyperlink at issue, discussed the sworn declaration submitted by Jacobs' and Adelson's lawyer's response. No party argues that the AP article misquoted or otherwise inaccurately characterized Jacobs' declaration. When the AP hyperlink is opened, an average reader would immediately realize that the petition draws upon a summary of judicial proceedings. Furthermore, as the district court noted, "[t]he hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law, because it has become a well-recognized means for an author or the Internet to attribute a source" and "the hyperlink instantaneously permits the reader to verify an electronic article's claims." *Adelson*, 973 F. Supp.

SUPREME COURT
OF
NEVADA

(O) 1947A

8

2d at 484. However, there is a drawback to hyperlinks as attributions—an average reader must identify a hyperlink, understand its importance, and ultimately open the link.[3] When a hyperlink is not found, understood, or opened by a reader, it has failed as a source of attribution.

It is clear that we must consider more than the underlying source material connecting to a hyperlink to determine whether the fair report privilege applies. Although courts have not addressed hyperlinks in the context of the fair report privilege, *Adelson*, 774 F.3d at 808, courts have extensively discussed hyperlinks in the context of whether they impart notice for the purposes of contract formation. In *Specht v. Netscape Communications Corp.*, the Second Circuit held that a terms and conditions hyperlink provided insufficient notice for users to assent to contractual formation. 306 F.3d 17, 31-32 (2d Cir. 2002). The court reasoned that the hyperlink was concealed by being placed a whole page below the download button, so users lacked constructive notice of the purported terms. *Id.*

Likewise, in *Nguyen v. Barnes & Noble Inc.*, the United States Court of Appeals for the Ninth Circuit held that a terms and conditions hyperlink at the very bottom of checkout webpages was insufficient to

---

[3]An additional drawback to hyperlinks is the concept of "link rot" where hyperlinks stop working because source URLs have been moved or removed. Jonathan Zittrain et al., *Perma: Scoping and Addressing the Problem of Link and Reference Rot in Legal Citations*, 127 Harv. L. Rev. F. 176, 177 (2014). If a hyperlink fails to connect a user to its underlying source, it will not bring a document within the fair report privilege under *Dameron*'s specific attribution test. However, here, the link was active and led to the AP article it referenced when the petition was online, so "link rot" or inability to access the hyperlink in this case are not material considerations.

impart notice upon purchasers. 763 F.3d 1171, 1178 (9th Cir. 2014). The court reasoned that online purchasers have a wide range of computer skills, and that "consumers cannot be expected to ferret out hyperlinks to terms and conditions" when no information on the checkout pages directed the purchaser to the hyperlink. *Id.* at 1178-79; *see also In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1062-63, 1066 (D. Nev. 2012) (applying Nevada law and finding that "[a] party cannot assent to terms of which it has no knowledge or constructive notice, and a highly inconspicuous hyperlink buried among a sea of links does not provide such notice"); *but see Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 841 (S.D.N.Y. 2012) (holding that a terms and conditions hyperlink was sufficient for constructive notice where the hyperlink was directly next to the signup button). Broadly, these cases look to "the conspicuousness . . . of the . . . hyperlink[ and] other notices given to users of the [hyperlink]" in determining whether sufficient notice has been provided. *Nguyen*, 763 F.3d at 1177.

These cases are analogous to the certified question because both standards ask whether an average person can identify and understand a hyperlink's importance. We adopt a similar approach in answering this certified question.

*Conspicuousness and textual explanation*

Although the AP hyperlink was in the second of four textual paragraphs in the petition, it is important to note that the hyperlink was placed in the same sentence as the content it purported to support. That is to say, the AP news article supported the proposition that a report existed stating that "Adelson 'personally approved' of prostitution." Thus, although the hyperlink was not conspicuous in a general sense, when reading the specific sentence the hyperlink functioned like a footnote. For

SUPREME COURT
OF
NEVADA

(O) 1947A

this reason, we conclude that the hyperlink was conspicuous in the context of supporting a specific claim.

Furthermore, the textual explanation accompanying the hyperlink notifies readers that the petition draws upon other sources. The sentence in which the hyperlink appears states: "But this week, reports surfaced that . . . **Adelson 'personally approved' of prostitution in his Macau casinos**." The sentence includes the qualifier "reports" and provides the operative hyperlink over the text "personally approved," which is quoted. The hyperlink also provides support for the text it covers (i.e., the AP report supports the proposition that Adelson personally approved of prostitution). Although there were other hyperlinks in the sentence, we conclude that the textual references help make apparent to an average reader that the petition draws information from another source. Also, because the AP hyperlink is contained within the same sentence, an average reader interested in what the "reports" stated would simply click on the AP hyperlink to learn more.

The AP hyperlink, as a specific, active, and accurate attribution, provides average readers notice that the petition draws from a summary of judicial proceedings because the petition's text indicates it is based on "reports" and the hyperlink's placement and function allows for it to operate like a footnote. Therefore, we conclude that the online petition, as it existed when Adelson's complaint was filed, fell within the purview of Nevada's fair report privilege.[4]

---

[4]The Second Circuit Court of Appeals also invited this court to weigh in on the "accuracy, fairness, and impartiality . . . requirements of the fair report privilege as [we] deem relevant to this case." *Adelson v. Harris*, 774 F.3d 803, 808 n.3 (2014). We agree with the United States District Court

*continued on next page...*

SUPREME COURT
OF
NEVADA

(O) 1947A

*Nevada's anti-SLAPP protections include speech that seeks to influence an election but is not addressed to a government agency*

Although no decisions addressing this matter existed when we accepted this question, we recently issued *Delucchi v. Songer*, 133 Nev., Adv. Op. 42, 396 P.3d 826, 830 (2017), in which we determined that in 2013 the Legislature amended portions of Nevada's anti-SLAPP statutes in order to "clarif[y] that, under NRS 41.637, the scope of the anti-SLAPP protections is not limited to a communication made directly to a governmental agency." Thus, Nevada's anti-SLAPP statutes, prior to the 2013 amendment as now, covered "[c]ommunication that is aimed at procuring any governmental or electoral action, result or outcome . . . which is truthful or is made without knowledge of its falsehood," NRS 41.637(1) (1997), even if that communication was not addressed to a government agency. *Delucchi*, 133 Nev., Adv. Op. 42, 396 P.3d at 830-31. We therefore refer the Second Circuit to our *Delucchi* decision to answer the second question.[5]

---

*...continued*

for the Southern District of New York's analysis as to the fairness, accuracy, and neutrality of the petition. *Adelson v. Harris*, 973 F. Supp. 2d 467, 486 (2013) (explaining that the petition accurately quotes Jacobs' declaration and that Adelson "had not yet filed the[ ] response to the Jacobs Declaration, so it cannot be seriously maintained that the Petition unfairly presented a one-sided view of the action").

[5]This determination, however, is not necessarily dispositive in the federal case. Even if the communication in this case was "aimed at procuring a[ ] governmental or electoral action, result or outcome," that communication is not protected unless it is "truthful or is made without knowledge of its falsehood." NRS 41.637(1) (1997); *see Delucchi*, 133 Nev., Adv. Op. 42, 396 P.3d at 829-30. However, the Second Circuit court did not address this issue and we decline to address it further.

## CONCLUSION

Based on the record before us, the fair report privilege immunizes the petition drafters from civil liability because the AP hyperlink provided sufficient source attribution to put an average reader on notice that the petition drew from an underlying summary of judicial proceedings. Furthermore, communications with either the government or the public that are intended to influence an electoral result potentially fall under NRS 41.637(1) (1997).

_____, J.
Hardesty

We concur:

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Parraguirre

_____, J.
Stiglich

SUPREME COURT
OF
NEVADA

(O) 1947A